Argued February 14, affirmed March 18, rehearing denied April 15, 1919.

# In Re DALE'S ESTATE.
## TOBIAS v. MATHEWS.

(179 Pac. 274.)

**Wills—Burden of Proof—Testamentary Capacity.**

1. The burden of proving testamentary-capacity rests in the first instance upon the proponent.

**Wills—Testamentary Capacity—Evidence.**

2. Evidence *held* to show that testatrix, 87 years old, was mentally capable of making will.

**Wills—Validity—Undue Influence.**

3. Daughter, contesting mother's will on the ground that beneficiary and her husband unduly influenced mother by slanderous statements, has burden of proof, which may shift upon proof of confidential relationship and other suspicious circumstances, such as activity of the latter in preparation of will.

**Wills—Undue Influence—Presumption.**

4. Undue influence is never presumed.

**Wills—Undue Influence—Circumstantial Evidence.**

5. Circumstantial evidence is often admitted to prove undue influence.

**Wills—Undue Influence—Confidential Relations.**

6. Confidential relations between testatrix and person charged with having exerted undue influence, though not in itself sufficient to create a presumption of undue influence, is a circumstance which taken in connection with other suspicious circumstances, may justify such an inference of undue influence as to shift burden of proof upon beneficiary.

**Wills—Undue Influence—Activity in Preparation of Will.**

7.  Activity in preparation of will by one who is charged with having exerted undue influence is a suspicious circumstance, which, considered in connection with the fact of confidential relationship between testatrix and such persons, may justify such an inference of undue influence as to shift burden of proof to beneficiary to disprove such influence.

**Wills—Will Contest—Evidence.**

8.  In daughter's contest of mother's will on ground that mother was unduly influenced to disinherit daughter, evidence of conduct of daughter's husband, while daughter and husband were visiting testatrix, was competent to show testatrix's antipathy toward him.

**Wills—Undue Influence—Sufficiency of Evidence.**

9.  In daughter's contest of mother's will, on ground that mother had been unduly influenced, by slanderous statements, to disinherit daughter, evidence *held* insufficient to show undue influence.

[As to unnatural or unjust disposition of estate as evidence of testamentary incapacity, see note in Ann. Cas. 1917E, 1.]

From Multnomah: WILLIAM N. GATENS, Judge.

Department 2.

This is a contest concerning the validity of a will executed by Anna E. Dale, deceased. The probate of the will was contested by Mrs. Mathews, on the ground (1) that the deceased was, at the date of its alleged execution, mentally incapable of making a will and (2) that said instrument was executed under and by reason of the undue influence, importunities, suggestions and persuasions of Mattie M. Tobias, a granddaughter of deceased, and her husband, David S. Tobias.

The matter was heard in probate before Hon. T. J. Cleeton, County Judge of Multnomah County, where a decree and findings were made sustaining the validity of the will and admitting it to probate. The matter was thereupon appealed to the Circuit Court and upon a hearing before Hon. W. N. Gatens, the decree of the County Court was sustained and thereupon contestant appealed to this court.          AFFIRMED.

For appellant there was a brief over the names of *Mr. J. H. Raley, Mr. E. H. Cahalin, Mr. M. H. Clark* and *Mr. B. G. Skulason,* with oral arguments by *Mr. Raley* and *Mr. Cahalin.*

For respondents there was a brief over the name of *Messrs. Wilbur, Spencer & Beckett,* with an oral argument by *Mr. S. C. Spencer.*

McBRIDE, C. J.—While the testimony in this case is voluminous, comprising over eleven hundred pages of manuscript, there is not a single question of law raised which is seriously disputed, the case depending primarily upon what we shall find to be the ultimate facts shown by the testimony and the application of well-known principles of law to such facts.

1, 2. The burden of proof to establish testamentary capacity rests, in the first instance, upon the proponent of the will, and without attempting to discuss the evidence in detail, we think it shows that decedent was mentally capable of making a will.

When this will was executed, she was probably about eighty-seven years of age, and the testimony of numerous witnesses established the fact, that she was a woman of unusual mental vigor for her age.  It is a remarkable circumstance that many persons much younger than she seemed to take pleasure in her society and in visiting and conversing with her.  She was apparently a favorite in her neighborhood, and those most intimate with her  speak in the highest terms of her sweet disposition and general intelligence.  She took and read the daily papers, conversed intelligently concerning current events, and her recollection of the early history of Portland, of which city she and her deceased husband

were pioneers, was a source of interest to those concerned with such matters.

In short, we conclude, that while subject to the bodily and mental depreciation that necessarily accompanies old age, it had not affected her faculties to even the extent which one usually expects to find in persons of her age.

Several letters written by her at various dates from January, 1912, to December, 1915, indicate that she was fairly in possession of her faculties and an industrious letter writer, and while there is some evidence to the contrary, the great preponderance of the evidence is to the effect that she maintained her mental capacity up to the time that the will in question was executed and even up to a very few days prior to her death.

The will was drawn by Col. S. C. Spencer, who received his instructions as to how it should be prepared, from Mrs. Dale herself after a long conversation and discussion as to its provisions. Prior to the time he was called upon to draw the will, he had no acquaintance with her, or with any of the parties mentioned in the instrument and therefore, could have had no motive in the matter beyond ascertaining the true intent of the testator and incorporating that intent in the instrument he was called upon to draw. He testifies strongly as to her intelligence and capacity to make a will, and taking this in connection with other testimony, we have no doubt but that at the time she executed the instrument, she knew and realized exactly what she was doing and that the will propounded, expressed the actual wishes of the testatrix as to what disposition should be made of her property after her death.

So far then, as the contention that decedent was mentally incapable of making a will is concerned, we are of the opinion that proponent has shown by the preponderance of the evidence that the testatrix was capable and that the will expressed the state of her mind at the time it was executed.

3. We now come to the second contention of contestant, namely, that such condition of mind was induced by the false and fraudulent statements of Mr. and Mrs. David Tobias and Geo. Tobias, a brother of David, in regard to Mr. Mathews and his wife, Nannie Mathews, whereby the mind of decedent was poisoned against her daughter and her husband to the extent that she was induced to revoke a prior will giving Nannie an equal share of the property and to make the will in question which practically disinherits her. In this contention, contestant has placed upon her the burden of proof in the first instance aided by certain presumptions which we shall hereafter notice.

It may be well in the outset to consider the reasons given by the testator for not making a larger bequest to her daughter, and for making her granddaughter and great granddaughter the principal legatees. The testimony indicates that she had conversed with her son-in-law, David, in regard to making a will. He testifies that she told him that she wanted a will drawn up and that she wanted his wife, Mattie, to have the Thirteenth Street property and his daughter, Helen, to have the Fourteenth Street property, and her daughter, Nannie, to have the Marquam Hill property, and that he remonstrated with her for not giving Nannie more and that substantially the following took place at this interview:

"I said, 'She is your daughter, grandmother, and she has helped some.'

"Grandmother said, 'David, if I give her one of those lots and the property that has got this indebtedness on it—if I give that to Mrs. Mathews, Mr. Mathews can come in and mortgage it, spoil the land and the value of the property and simply ruin it and all that property I worked all those years for—it is mine, I can do as I like with it—it would be gone.'

"She said, 'David, you do not really realize what this property is to me. It·is something I have toiled for for many years.' She then said, 'Well, you talk it over with your attorney and explain all about it to him and see what he says.' "

There is no controversy that pursuant to this interview witness had Mr. Haas, his attorney in Seattle, prepare a will by the terms of which among other things, Mrs. Tobias was to receive the Thirteenth Street lot, one of the two valuable lots owned by the testator, in fee—the Fourteenth Street lot, the other valuable lot, was devised to David in trust to collect the rents for a period of five years after testatrix's decease, and to divide the income equally between Mrs. Mathews and Mrs. Tobias, and at the expiration of the five-year period, the property was to be conveyed to Mrs. Mathews, if living, but in case of her death, the property was to be conveyed to Mrs. Tobias.

David Tobias sent his wife to Portland with this draft, which the evidence indicates that Mrs. Dale rejected absolutely, declining to leave any of the property except the comparatively valueless Marquam Hill lots to Mrs. Mathews. As before noted, Col. Spencer, a stranger to all parties, was called in consultation in reference to the preparation of the will and discussed the matter thoroughly with the testatrix, and his account of the interview is substantially as follows:

"A. Well, she told me that she thought she ought to tell me and that there was some friction. She told me about the fact that there was friction between herself

and her daughter and she said that that grew largely out of her dislike for Nannie Mathews' husband, Mr. Mathews, whose first name I do not now recollect.

"Q. Did she make any statements to you regarding Mr. Mathews—Nannie Mathews' husband?

"A. Yes, sir.

"Q. What did she say?

"A. The burden of it was to this effect. He was a sort of a ne'er-do-well and she was afraid that if Nannie Mathews got this property—she explained to me that there were two lots, the Thirteenth and Fourteenth Street lots—there had been erected a building on those two lots and the building on both lots was all one building and she was afraid that if Nannie Mathews got it that through her husband they would lose it and Nannie Mathews would be left without anything and at any rate there would be trouble, and she though that if her granddaughter that is, David S. Tobias' wife, and their child—their little daughter Helen, had it that it would be conserved and she wanted it to go that way and she told me all about how she had worked for it and that she did not want to dissipate it."

In this interview seems to be the secret of the discrimination made by Mrs. Dale against her daughter. She disliked and distrusted her daughter's husband and had a firmly fixed idea that the property would be wasted and encumbered if he was left any opportunity to handle it. She had an old pioneer's pride in arranging her affairs in such a way that this property, earned and kept through years of toil and hardship, should not be squandered or dissipated after her death. Her view of the situation may not have been correct and her method of disposing of the property may not commend itself to the unprejudiced observer.

It does not commend itself wholly to the writer, but it was Mrs. Dale's property and it was her privilege to dispose of it as she thought fit; to give it to her

granddaughter or to charity or to a stranger, unless her disposition of it was brought about by mental incapacity or the fraud and deceit, or undue persuasion of someone to the extent that her normal faculties yielded to the overmastering mind, so that the will would not have been so made but for such fraudulent practice.

This is exactly the contention made by the contestant here. It is claimed that after David S. Tobias became a member of decedent's family by marriage with her granddaughter, he systematically ingratiated himself into the affection and confidence of Mrs. Dale, and by means of slanderous statements and false insinuations against Mr. Mathews and his wife so poisoned her mind against them and aroused her prejudices that she lost her affection for them and for that reason practically disinherited Mrs. Mathews. If this is substantially true and so established, this will ought to be set aside.

4, 5. Undue influence of this character is never presumed but must be proved like any other fact, but as it is frequently incapable of being established by direct testimony, circumstantial evidence is often admitted for that purpose.

6, 7. In considering the question as to whether or not undue influence has been exerted in a particular case, one is naturally led, first, to inquire into the opportunities which the person accused of this species of fraud, had to exert such control over the intention of the testator. Among these is the existence of confidential relations between the testator and the person so charged. While the existence of such a relation will not of itself, according to the weight of authority, create a presumption of undue influence, it is a circumstance which, taken in connection with other suspicious circumstances, may justify such an inference of undue

influence as to put upon a beneficiary the burden of showing, by at least equal evidence and in many jurisdictions, by the preponderance of evidence, that no such influence was exerted. Activity in the preparation of a will, which inures to the benefit or enrichment of the person accused or members of his family, is one of these circumstances.

In the case at bar there is little reliable testimony that Mrs. Tobias ever attempted to exercise any influence over Mrs. Dale to induce her to make the will in question or to make any particular disposition of her property. It is shown that David Tobias stood high in the esteem of his wife's grandmother, that she confided greatly in his business capacity, and had for him. apparently all the affection which a mother usually has for a son—an affection which he requited by looking after her business affairs, superintending in a way the erection of a profitable business building upon the lots owned by her, and by constant filial attentions to her material wants.

There is no doubt of her confidence and affection for him, but there is not, in our judgment, sufficient proof to indicate that he abused this affection and confidence, to prejudice her against Mrs. Mathews and her husband. It was general knowledge in the family for years, that Mrs. Dale had executed a will, which practically divided her property equally between her daughter, Mrs. Mathews, and her granddaughter Mrs. Tobias, whom she had partially reared and who was evidently very dear to her. Everybody concerned seemed to acquiesce in this will and to assume that their succession to the estate would follow, according to its provisions, upon Mrs. Dale's death.

Acting upon this presumption, both Mrs. Mathews and Mr. Tobias assisted in protecting the estate dur-

ing the period of Mrs. Dale's poverty, by paying taxes and assisting her in various ways. Upon one occasion, Mr. Mathews bought a building which was situated upon neighboring property, to be moved upon one of the lots and fitted up for rent as a residence, and this at an expense of several hundred dollars to himself, while it added considerably to Mrs. Dale's small income. Until the Mathews went away to Pendleton, there was nothing in the relation of the parties that indicated any particular inharmony between the testator and her daughter, although from declarations made to other parties it appears that Mrs. Dale had a strong objection to certain habits of Mr. Mathews and that these objections were formed largely from personal observation and not from anything told her by David or Mrs. Tobias.

8. Mr. Barrett, who appears to be an intelligent and disinterested witness, testifies that Mrs. Dale told him that when Mr. and Mrs. Mathews were stopping with her, Mr. Mathews would come in, up to as late as 2 and half-past 2 and sometimes 3 o'clock in the morning. That she would sit up there waiting for him to come in. "He was out that late and holding her up from going to bed and breaking her down and making her nervous and she could not stand it much longer." As evidence of the substantive fact that Mathews had such habits as detailed, this testimony would perhaps be incompetent, but as tending to show Mrs. Dale's state of mind and the reasons she gave for her antipathy toward him, it is competent. The reasons she gave for her disapproval are summed up by this witness as follows:

"In her mind he was a saloonman. He was a barber and the best she could figure, he gambled and drank

to extreme and he was not fitted as a man to deal in
any respect as to her property and did not come up to
her ideal at all as a man.''

The fact seems to have been, that he was not par-
ticularly thrifty, that he varied the respectable occu-
pation of a barber by occasionally following the voca-
tion of keeper of a pool-hall and bar-keeper in saloons,
and that these facts, rather than anything told her by
David or Mattie, created in her mind such a distrust
that she was unwilling to risk a possible danger that he
would waste and dissipate any property she might
leave to her daughter.

Her letters indicate that she was quite as well ad-
vised of the movements of Mathews and his wife, as
were David and Mattie. In her letters she is more
frequently giving her granddaughter and her husband
news of the doings of her daughter and Mr. Mathews,
than inquiring of them in regard to the matter. That
she was seriously offended because Mathews had seen
fit to take the initiative with Mr. Watkins in regard to
the construction of a house on the lots is disclosed in
her letters. Probably Mathews did not mean to be
officious in the matter, but that he should take it up
with Watkins without previous consultation with her
evidently offended her. She is not here to give her
own side of the controversy, but we have no license to
guess that her anger in regard to it was begotten by
anything David or his wife injected into it.

Another quarrel in 1914 seems to have brought
about a final rupture, and that it is evident that this
was not brought about by David or Mattie is shown
by Mrs. Dale's letters to them relating the circum-
stances. The first letter is as follows:

"Portland, Apr. 14, 1914.

"My dear Mattie, David and my little sweetheart:

"I hope in God you are all well and Mattie alright and up I am so tired and nervous I can hardly write. I moved in to my old home in the morning at 9 o'clock and it raining and who do you think was walking in the lot only Tom. I why you are early. What do you want here I was out this way I said its its a long way and raining and Zek told Mrs. Crain not to pay Mrs. Watkins any more rent but to send it to him to Pendleton that he had full control of the place. She told him no Mrs. Dale is my landlady. Why they are the whole talk of the place you ought to hear Patterson. So I hear you are going to build a fine apartment house all modern nothing like it and every one was so glad to see me they surely made me welcome. Guess they sent Tom out to hear the news. Mrs. Patterson says Nany told her she was going to live in 106 but it was rented and she didn't know. She's living out on Gleason I havn't seen her I surely have had it rough this was the dirtiest place but of course I had to move the man was not going to move but Nany told him the place was all going to be torn down and built on or he wouldn't stir.

"Zek told Mrs. Crain he had sold out in Pendleton and he told the women next door if the house wanted fixing to get it done and send the bill to him. Every one says its a good thing Mattie didn't come down for they just wanted her to sign something they had made out. I am going to see the carpenter that had the job. I got the flowers and the cross buns they were nice and the flowers I took to Church. Wish to thank you for No more from Grandma.

"Write soon and tell me how Mattie is getting along."

By "Zek" mentioned in the foregoing letter the writer meant to designate Mr. Mathews. Here we find the decedent giving Mrs. Crain and Mrs. Patterson as authority for the supposed interference of the Mathews in her affairs and telling it as news to Mr. and

Mrs. Tobias.  That she resented it very seriously is shown by another letter written a month later, which is as follows:

"Portland, May 14th, 1914.

"My dear Mattie, David and my little sweetheart:

"I hope you are all well   I got the package   thanks Nany rang the bell and said Halo Mother   I never said a word   she came in and I said arn't you an awful worm to try to commit forgery   if I wanted I could send you and your husband to the pen   I told her all the people told me and she denied it   she asked me was the place leased   I told her she didn't have to know my business   I said I guess you are working on your name being in that will that is what I told Watkins when I went after it when he gave it to me   I said to him this little piece of paper has made all this work and he said you arn't going to change it   I told him he didn't know me yet   I told her I didn't wait to take off my things but tore it in pieces and put a match to it.   I told her it was where it wouldn't make any more trouble for me.  The two houses on 13th St. is gone today the man was taking the windows on 14th away Lauler said not to let them touch a thing   I don't see how Nany could say I looked bad   don't try to get any one for these rooms has to be fixed   she told me she was here to buy furniture and going to live at White Salmon   When you come bring what you can spare no matter how old in bed clothes   I have the house nice and clean   you can see how bad this is wrote   its scrawled   But its night and I can't see the lines George and Bill was here Sunday.

"Well I must say good-night.

"From GRANDMA.

"When Mattie is coming you can send a little good whiskey but not with anyone else."

But it is impossible, within any reasonable space, to attempt to trace the cause of the alienation of affection between mother and daughter resulting in the destruction of the old will and the execution of the will

here propounded. There is no reliable testimony which establishes the contention that the change was induced by any fraudulent act of proponents. On the contrary, if Mrs. Dale had been the willing instrument in their hands which contestant would have us believe, she would have executed the will suggested by David and prepared by Mr. Haas, which would have eventually preserved Mrs. Mathews' interest in the property. It was as nearly an approximation to the Watkins will as Mr. and Mrs. Tobias could have hoped Mrs. Dale would execute.

In a fit of resentment, she had destroyed that will which made what would seem to have been a fair distribution, and it was natural that Mrs. Tobias, who seems to have been, in all except that she was a degree in kinship removed, a daughter to the testator, should have some anxiety that she should not die intestate. David, knowing Mrs. Dale's feelings in regard to Mr. Mathews, had prepared a will that there was some hope that she would sign, but with all her amiability, there was a strain of self-will that could not be overcome by persuasion. She knew just what she wanted to do and did it.

Many witnesses were called by the contestant to show that Mrs. Dale was incapable at certain periods to make a will. Some of this testimony is so extravagant that the judge who heard the cause in the first instance evidently did not credit it. He had the advantage of having the witnesses before him and being, thereby, better able to appraise the evidence than we who have only the results in manuscript.

This court has always protected with jealous care the right of persons to dispose by will of that which they have earned by toil. We can only consider the justice or injustice of a will as indicating the mental

condition of the testator. In a large number of will contests which come before us we might, were we dictating such instruments, make a different disposition of the property from that contained in them. But so long as a will is the offspring of the mind of the testator, uninfluenced by disease and untainted by fraud, it must stand, even if its provisions seem harsh.

9. We have carefully considered all the evidence here and are of the opinion that proponents have shown that the will propounded was the intelligent and voluntary act of the testator and was not the offspring of undue influence or fraud.

The decree of the Circuit Court is affirmed.

AFFIRMED. REHEARING DENIED.

BEAN, JOHNS and BENNETT, JJ., concur.