Motion to dismiss denied May 27, 1924; motion to abate *ab initio* denied November 17, 1925; motion to correct transcript allowed January 12, argued on the merits June 24, reversed November 3, rehearing denied December 7, 1926.

# In the Matter of the Estate of PIERCE RIGGS. ETTIE MAE RIGGS *v.* SETH RIGGS et al.

### (241 Pac. 70; 250 Pac. 753.)

**Wills—Will Contest not Abated by Contestant's Death Pending Appeal.**

1. Where will contestant obtained decree, on ground of fraud in procuring execution of the will, which in effect passed title to all testator's property to contestant, testator's widow, and, pending appeal therefrom, in which no stay or *supersedeas* bond was given, contestant died, leaving her surviving her father as sole heir and residuary legatee and devisee, motion in Supreme Court to abate all proceedings *ab initio*, on the theory that right to contest a will, being personal, dies with the person, would be denied; the decree being an asset of her estate, which her heirs had a right to litigate.

**Wills—Substitution of Parties Could be Made in Supreme Court.**

2. Where will contestant obtained decree on ground of fraud in procuring execution of the will, which in effect passed title to all testator's property to contestant, testator's widow, and, pending appeal therefrom, in which no stay or *supersedeas* bond was given, contestant died, *held* that, although there had been no substitution or application therefor, it was not too late to have such substitution made in Supreme Court if either party desired it.

### ON THE MERITS.

**Wills—Proponents of Will must Re-probate It in Original Form, Where Its Validity is Attacked in Direct Proceeding.**

3. Where validity of will probated in common form is attacked in direct proceeding, burden is on the propounders to re-probate it in solemn form, in same manner as if no probate of will had been made, except as to matters admitted by pleadings.

**Wills.**

4. In re-probate of will, validity of which has been attacked by direct proceedings, burden to show testamentary capacity of testator and formal execution of instrument is on propounder.

**Wills.**

5. Burden of establishing allegation that contested will was product of undue influence is on contestant.

---

1. On effect of death *pendente lite* of one having right to contest will, see note in L. R. A. 1918A, 480.

5. See 28 R. C. L. 398.

Wills.

6. Though burden of proving testamentary capacity is on proponents of will, they have benefit of evidentiary presumption that one executing will in due form is competent to make such a testament.

Wills.

7. "Testamentary capacity" is to be decided on facts of each case; question being, Was will the free and intelligent product of testator's mind or not?

Evidence.

8. Under Section 727,. Or. L., subscribing witness to will, when its validity is questioned, may testify to his opinion respecting mental sanity of person signing will.

Evidence.

9. If witnesses to will are intimate acquaintances of testator, they may express opinion as to sanity of testator; reason for opinion being given.

Wills.

10. In a will contest, ultimate question to be determined, whether testator was capable of making a will, is for court.

Wills—Complaint by Testator of Ten-cent Tip Given by Wife Does not Show Change of Mental Attitude to Prove His Insanity, Where Previous Acts Show Same Consideration for Small Items.

11. In will contest, complaint by testator of ten-cent tip given by his wife does not indicate change in mental attitude, showing testator to be childish or insane, where he was previously shown to have kept record of items of a few cents given to church and wife.

Insane Persons.

12. Radical change in person's habits and thoughts is evidence of insanity.

Evidence—Conclusion of Insanity, Based on Hypothetical Question Assuming Change in Mental Attitude from Objection to Ten-cent Tip, not Based on Facts, Showing Testator to have Been Miserly All His Life, must be Rejected.

13. Conclusion by alienists that testator was insane, based on hypothetical question assuming that small matters, such as objection to ten-cent tip marked a change in testator's mental attitude, which was not based on facts, showing testator to have been miserly all his life, must be rejected.

Wills.

14. Evidence of economy and business dealings by decedent *held* to establish his capacity to make will.

---

7. See 28 R. C. L. 86.

Wills.

15. Evidence *held* not to show that beneficiaries of will exercised any undue influence over decedent in making of his will.

Wills.

16. "Undue influence" to set aside will must be such as to overcome the free volition or conscious judgment of testator and to substitute the wicked purposes of another.

Wills.

17. Suggestion or advice by friend, relative or one in confidential relation is not "undue influence" invalidating will, if it leaves mind free to act on its own judgment.

Wills, 40 Cyc., p. 1021, n. 12, p. 1023, n. 29, p. 1035, n. 29, p. 1038, n. 48, p. 1144, n. 53, p. 1145, n. 54, p. 1146, n. 61, p. 1150, n. 91, 92, p. 1232, n. 25, p. 1233, n. 28, p. 1234, n. 44.

From Multnomah: GEORGE TAZWELL, Judge.

In Banc.

Pierce Riggs, husband of Ettie Mae Riggs, died in November, 1922, leaving an alleged will devising his property to his relatives to the exclusion of his wife, and naming Seth Riggs, his brother, Webb C. Lewis, his brother-in-law, and Cecil L. Riggs, his nephew, as executors. The will was presented for probate in common form and so admitted to probate November 15, 1922. On April 24, 1923, Ettie Mae Riggs, the widow of deceased, filed a petition for contest, alleging undue influence upon the part of the relatives of the deceased, and also a lack of testamentary capacity on the part of the deceased to execute the will, and asked that the order admitting the will to probate be set aside and that the petitioner be appointed administratrix of the estate of the deceased. The executors answered, alleging the validity of the will, and the matter went to trial before Honorable GEORGE TAZWELL, Judge of the Probate Department of the Circuit Court of Multnomah County, who found against the

16. See 28 R. C. L. 137.

proponents and in favor of the contestant, the finding
being that the execution of the alleged will was pro-
cured by fraud and by undue influence of the pro-
ponents exercised upon the deceased. There was no
finding upon the issue of testamentary capacity. The
appointment of the executors was revoked and Mrs.
Riggs was adjudged to be the sole heir of said de-
ceased and appointed administratrix of his estate, and
the former executors were required to account for all
transactions by them as executors with reference to
the estate, and to deliver to the administratrix all the
assets thereof.

On January 14, 1924, the executors duly served and
filed their notice of appeal and an undertaking for
costs upon appeal, but no stay or *supersedeas* bond of
any character. Pending this appeal, Ettie Mae Riggs
died in Multnomah County, Oregon, on the seventh
day of May, 1925, leaving surviving her as sole heir,
next of kin and residuary legatee and devisee under
her will, her father Merton Elwood, who was ap-
pointed executor of Mrs. Riggs' will.

MOTION TO ABATE AB INITIO OVERRULED.

For the motion, *Messrs. Flegel, Reynolds, Flegel &
Smith* and *Mr. John K. Kollock.*

*Contra, Mr. Wm. A. Carter, Mr. J. L. Hammersley,
Mr. Franklin F. Korrell* and *Mr. MacCormick Snow.*

McBRIDE, C. J.—The appellants now move the
court for an order abating all proceedings *ab initio*
and that the Circuit Court of Multnomah County be
directed to dismiss the proceeding in relation to the
contest of the will, the theory being that the right to
contest the will is personal and dies with the person
who has such right; that there is no such property

right in the contestant as can be bequeathed or pass to her heirs, and that no person can be said to be interested, within the meaning of the statute so as to permit a contest, who had not an interest existing at the time of the original probate of the estate. In support of this position appellants cite *Storrs* v. *St. Luke's Hospital,* 180 Ill. 368 (54 N. E. 185, 72 Am. St. Rep. 211), and several other Illinois cases following the principal case. Also, *Diffenderffer* v. *Griffith,* 57 Md. 81, and *Ligon* v. *Hawkes,* 110 Tenn. 514 (75 S. W. 1072). None of these cases is exactly in point, as to the facts, with the present case although they bear some general resemblance.

1. In the instant case the contestant, Mrs. Riggs, had a decree in her favor, which conferred upon her the title to a large amount of property. The appeal taken by the proponents did not stay the effect of this decree or suspend its operation in any way. *Prima facie,* she had a valuable property right, which she could enforce by an application to the court at any time, and it was as much her property and the property of her estate as any other judgment could have been. There is no reason for holding that this will and contest was merely a matter *in personam* between Mrs. Riggs and the executors or the heirs of her husband. It was more than that; it had in effect passed the title to all the property of the deceased Riggs to the widow, and to that extent, it was an asset of her estate, which her heirs had a right to litigate. The principal case, *Storrs* v. *St. Luke's Hospital, supra,* cited by appellants, has been severely criticised by several courts and is not accepted in its entirety by any court: *Ingersoll* v. *Gourley,* 78 Wash. 406 (139 Pac. 207, Ann. Cas. 1915D, 570), and cases there cited. It is not only opposed by the weight of authority, but

is palpably unjust. Take the facts of this case as an example,—here, the court has found that this will is void on account of the wrongful and fraudulent acts of the proponents and the contestant is given a decree carrying with it title to the property mentioned in that will and taking it away from the executors and legatees and vesting it in the widow of the deceased Riggs; and we are asked now by this motion to vacate that order without a hearing and thereby vest in the executors and legatees the title to the property, which the court below has held that they have attempted to obtain by fraud. To do this would be to strain the construction of the law in favor of what the lower court has found was a fraudulent attempt by proponents to obtain what they had no legal right to.

2. There has been no substitution in this case and no attempt by either party to have substitution made. It is not too late to have such substitution made in this court if either party desires it.

This is an interesting matter and really merits a more extended discussion than we have given it, but the business of the court is much congested, and we do not feel that it is necessary to pursue the subject further.

The motion to abate *ab initio* is overruled.

Motion Overruled.

## On the Merits.

This is an appeal from the Circuit Court for Multnomah County, Honorable George Tazwell, Judge, sitting as a court of probate. The appellants are the devisees and executors named in the will of Pierce Riggs. The appeal is from the decree of the Circuit Court entered January 2, 1924, setting aside the will

and appointing the testator's widow, Ettie Mae Riggs, the respondent, as administratrix. The entire estate was appraised at $121,235.81, of which the real property was $39,250.

Subject to the widow's dower, and such exempt property as may be set aside to her, and additional allowance made by the probate court, the entire estate is given by the will to the three executors for the purpose of reducing it to a form convenient for distribution and distributing it in specified shares among the testator's brothers, sisters, nephews and nieces, eleven in number. The executors are authorized to agree with Mrs. Riggs to a voluntary partition, or assignment of dower, or to a substitution for dower.

This will of Pierce Riggs was proved in common form November 15, 1922, by the testimony of J. Purvine, B. Lee Paget and John W. Reynolds, the subscribing witnesses. Seth Riggs, Webb C. Lewis and Cecil L. Riggs were appointed as executors in accordance with the will. The present contest proceeding was begun by Ettie Mae Riggs, the widow of decedent, by the filing of a contest petition and issuance of citation to the three executors named. The executors answered and contestant replied. The grounds of contest are two, first, that testator was not mentally competent to make his will, and second, that he was unduly influenced by Seth Riggs, testator's brother, and by other persons unknown.

The testator was born in August, 1852, and at his death November 8, 1922, was seventy years of age. He was a member of a highly respected pioneer family of Polk County, Oregon, of exemplary moral habits, of strong will, of keen business sense and economical to the point of parsimony. He was a

bachelor until April, 1915, when, at the age of about sixty-three years, he married the contestant, who was then about thirty-six years of age. He had by his thrift and frugality accumulated a fortune. The contestant was without means and was working as a dressmaker for some time prior to her marriage.

The testator had spent much of his life in association with his brothers and sisters at the old family farm home in Polk County, Oregon, and for many years had been one of the same household with his brother Seth and his sister Emma, both of whom have remained unmarried. For the last four years preceding his marriage, testator had boarded and lodged with Jordan Purvine and wife of Portland, Oregon. He often visited at the home of Seth and Emma Riggs, who for many years have resided together at Portland.

The will in contest was executed May 17, 1919, about four years after testator's marriage and about three and one-half years prior to his death, which occurred November 8, 1922; decedent died of an intestinal ailment, technically called "diverticulosis," which had probably for some time contributed to the ill health he experienced the last years of his life; but that diagnosis was not made until a short time before his death. In the autumn of 1916, testator's health was greatly impaired and for several months he was under the care of a physician. He made a trip to California accompanied by his wife and a nurse, Mrs. Parry; leaving Portland February 8, 1917, and returning April 20, 1917, somewhat improved. From that time until his death he resided at 360 Ivy Street with his wife under her almost constant care.

REVERSED.   REHEARING DENIED.

For appellants there was a brief over the name of *Messrs. Flegel, Reynolds, Flegel & Smith,* with oral arguments by *Mr. John W. Reynolds* and *Mr. John K. Kollock.*

For respondent there was a brief over the name of *Mr. J. L. Hammersley,* with oral arguments by *Mr. William A. Carter* and *Mr. Franklin F. Korell.*

BEAN, J.—A motion was filed by contestant and respondent to dismiss the appeal. The record pertaining to this motion was examined by the chief justice, and the motion was denied with permission to renew the same at the time of the argument upon the merits. Upon further examination we find that there is no additional reason suggested for sustaining the motion and no reason appears for any different ruling thereon. Therefore, the order denying the motion is made final.

There are two questions on this appeal. Did Pierce Riggs possess testamentary capacity on May 17, 1919, the date of the will, and if so, was he at the time he executed the will, subject to undue influence? The Circuit Court decided that the testator was unduly influenced.

3, 4. Where a will has been probated in common form and its validity has been attacked by direct proceedings, the burden is on the persons propounding the will to re-probate the same in solemn form, by original proof in the same manner as if no probate of the will had been had, except as to such matters as may be admitted by the pleadings. In such a proceeding the *onus probandi* to show testamentary capacity of the testator and formal execution of the instrument is upon the party propounding the will:

*Hubbard* v. *Hubbard,* 7 Or. 42; *In re Sturtevant's Estate,* 92 Or. 269, 276 (178 Pac. 192, 180 Pac. 595); *King* v. *Tonsing,* 87 Or. 236 (170 Pac. 319). In the latter case Mr. Chief Justice McBride used these words:

"The burden of proof was upon the proponent to establish the testamentary capacity of the deceased by the preponderance of the testimony."

See, also, *Deckenbach* v. *Deckenbach,* 65 Or. 160 (130 Pac. 729); *Wade* v. *Northrup,* 70 Or. 569 (140 Pac. 451).

5. The burden of establishing the allegation that the will in contest was the product of undue influence devolves upon the contestant.

In *Re Sturtevant's Estate, supra,* Mr. Justice Burnett stated the reason for the rule as to the burden of proof respecting testamentary capacity and undue influence, at page 277 of the Report, as follows:

"If there is no will in existence, the property of a testator is distributed according to the statute of descents. If anyone would interrupt this course of distribution he must show not only a properly executed will but that there was a testator competent to publish such a document. The persons naturally interested in the estate under the statute of descents have not had their day in court where the will has been admitted to probate in common form. Consequently, the burden of making a different disposition of the property lies upon him who propounds the will to show that the testator had testamentary capacity and that the instrument in question was executed in due form of law. On principle, the question is different where the effort is to overturn the will on the allegation that it is the product of undue influence. This is a species of fraud by the exercise of which the nominal testator is supposed to have been deluded into making a disposition of property which is not the

product of his own mind." See *Simpson* v. *Durbin*, 68 Or. 518 (136 Pac. 347).

6. While the burden of proof as to testamentary capacity is to be borne by the proponents, still they have the benefit of the evidentiary presumption that one executing a will in due form is competent to make such a testament: *Holman's Will*, 42 Or. 356, 357 (70 Pac. 908); *Greenwood* v. *Cline*, 7 Or. 17; *Chrisman* v. *Chrisman*, 16 Or. 127, 129 et seq. (18 Pac. 6). As stated in 28 R. C. L., page 139, section 92:

"An attack on a will on the ground of undue influence concedes the existence of testamentary capacity; and when a person wholly lacks testamentary capacity there is no room for the operation of fraud or undue influence in the execution of his will. Yet the undue influence which will invalidate a will depends to a very considerable extent on the intellectual capacity and firmness or the facility of disposition of the testator. Obviously, it requires much less influence to control the will of a person of weak mind and infirm purpose than one of vigorous intellect and determined character."

7. No particular degree of acumen will serve as a standard for testamentary capacity. Each case is to be decided upon its own facts and circumstances. The question is, Was the will the free and intelligent product of the testator's mind or not? 1 Schouler on Wills (5 ed.), § 88 et seq.; *Galt* v. *Provan*, 108 Iowa, 561 (79 N. W. 357, 360).

8–10. Under our statute, Section 727, Or. L., it is competent for a subscribing witness to a will when its validity is questioned to testify as to his opinion respecting the sanity of the person who signed the will. If the witnesses are intimate acquaintances of the testator, they can properly express their

opinion, the reason for the opinion being given. The ultimate question to be determined of whether the testator was at the time capable of making a will is for the court: *In re Sturtevant's Estate, supra; In re Faling's Estate,* 113 Or. 6 (228 Pac. 821, 231 Pac. 148).

On the question of the testamentary capacity of the testator it is stated in the case of *Ames' Will,* 40 Or. 495, 504 (67 Pac. 737), as follows:

"The rule is settled in this state that if a testator at the time he executes his will understands the business in which he is engaged, and has a knowledge of his property, and how he wishes to dispose of it among those entitled to his bounty, he possesses sufficient testamentary capacity, notwithstanding his old age, sickness, debility of body, or extreme distress:" (Citing authorities.)

See, also, *Skinner's Will,* 40 Or. 571, 576 (62 Pac. 523, 67 Pac. 951); *Pickett's Will,* 49 Or. 127, 150 (89 Pac. 377); *Stevens* v. *Myers,* 62 Or. 372 (121 Pac. 434, 126 Pac. 29).

Pierce Riggs for many years resided upon the farm in Polk County, Oregon, which had been his father's, together with other members of the family. For some time prior to their removal to Portland, Oregon, he lived with his sister Emma and brother Seth. He was industrious, careful and economical, and amassed quite a fortune. As his fortune increased his economy became parsimonious and picayunish.

He appeared to have been in the habit of keeping strict account of his business and expenses, such as personal and family expenses. He kept a separate automobile account in which he charged an expenditure of five cents. He was also wont to make memoranda of various things, among them a long list of medicine receipts, commencing in 1888, taken from

120 Or.—4

prescriptions and medical works. He harped about the high cost of living. He manifested an interest in taxes and the issuance of public bonds. From the summer of 1922 he was unable to leave the house. After he was unable to attend the polls at an election he marked a sample ballot for his wife to follow in voting.

He was a bachelor until he arrived at the age of nearly sixty-three years, when he was married to Ettie Mae Elwood in April, 1915. She was then of the age of thirty-six years. For about a year matters ran quite smoothly with them. They established their residence in Portland and after a few months took a trip to California and farther south. Pierce Riggs met Mrs. Riggs' father and mother in California and after a time they came to live in Portland. Pierce Riggs fixed up a house of his for them to live in, and in working under the house manipulating a jackscrew, in the fall of 1916, he injured his left arm. On his return home his wife told him he had overdone himself. His arm was troublesome all the rest of his life, and some of the witnesses thought he had a paralytic stroke. It appears that after his father-in-law and mother-in-law came to reside in the house Pierce Riggs charged them no rent.

In the fall of 1916 Pierce Riggs suffered what is termed a "breakdown" in health. On February 8, 1916, in company with his wife and a nurse he started on a trip to different places in California, returning in April, 1917, somewhat improved. On this trip he was sick, nervous, exacting, cross and fussy. He had stomach trouble, called "diverticulosis," and food seemed to be nauseating to him and he ate only

because he had to do so. He relished nothing and found fault with his food. The testimony indicates that, viewed from his naturally stingy standpoint, the expenses of the trip were overwhelming to him.

The Riggs family was very closely united. They had family reunions now and then, one of them occurring in June, 1919, soon after the will was executed. Pierce Riggs seemed to have implicit confidence in his brother Seth Riggs. When Pierce Riggs' health failed him in the fall of 1916, and before his trip to California, he gave the principal part of his business in charge of Seth Riggs. He retained the care and oversight of the ranch in Polk County, which was usually rented. Pierce Riggs was largely engaged in loaning money on real estate mortgages. After Seth Riggs assumed the general charge he engineered the loans through loaning agents, but in most every instance consulted Pierce Riggs in regard to the security before making the loan.

It is claimed on behalf of contestant and respondent that after Pierce Riggs' "breakdown" in 1916, and particularly the seventeenth day of May, 1919, Pierce Riggs was of unsound mind and incapable of making a will. The testimony is too lengthy to refer to all of it and space will permit comment upon only portions thereof. It consists of over seventeen hundred pages of typewritten testimony. The witnesses to the will, relatives and acquaintances, physicians, some of whom treated him during his illness, and also eminent. alienists testified at length in the case. The testimony is conflicting to a certain extent, evidently depending upon the viewpoint of the witnesses. The testimony of the alienists is based upon a hypothetical question of great length, many facts

narrated in which are in dispute and the conclusions appear to have been drawn from the statements made upon the opposite sides.

It appears from the testimony that during the time it is claimed by contestant that Pierce Riggs was incapable of transacting business he consummated several deals, or business matters of importance. He executed a deed of real estate in December, 1919, and on the twenty-third day of December, 1919, he executed an assignment of sheriff's certificate of sale of a city lot. He wrote and signed several checks on the bank where he had a deposit, and signed some others which were written for him by his wife. These checks ranged in amount from $20 to $1,000.

On May 26, 1920, Pierce Riggs wrote and signed a check in favor of B. Lee Paget, or order, for thirty-five dollars. Preceding the words designating the amount of the check, in the usual place was inserted the figures "$3500 00/". On account of the error in not placing the decimal point in the proper place between the figures, the counsel for contestant criticised the transaction as being done by a man not capable of transacting business. Much is claimed for this error. There was no room for mistake in understanding the amount of the check. It was regularly indorsed and paid at the bank.

Examination of the accounts kept by Pierce Riggs with much care during the years 1914 and 1915 indicates that he was careless in regard to placing the decimal point between dollars and cents, and omitting the same in making memoranda, as usually in his books dollars and cents were divided by a red line.

What appears to be a fair sample of checks written and signed by Pierce Riggs not long before his death is the following:

Letters in the record written by Pierce Riggs in relation to his farming operations show his tact and care in business transactions, particularly during the year 1918, when it is claimed by contestant that he was incompetent to transact business. It appears that he had furnished a tenant of his farm with a pair of horses, taking a mortgage thereon in the sum of $250 to secure the payment therefor. The next tenant desired to exchange the horses for another pair and was to receive $125 in exchange. Pierce Riggs wrote to his nephew, Webb C. Lewis, at Rickreall, Oregon, on the 25th of January, 1918, giving him information and requesting him to look after the matter. A few days later he wrote explicit instructions to his nephew in substance as follows:

"360 Ivy Street, Portland, Oregon.
"January 29th, 1918.
"Mr. Webb C. Lewis,
    "Rickreall, Oregon.
    "Dear Nephew: Yours just to hand. I allowed S. H. Hanks fair and liberal for all this stuff.

There is nothing to release, except the horses. I think you have it figured right. When Sherwood pays you the $125.00, you fix up the release and send to me to sign and return to you. You better take the mortgage and new note from Purvine, Cy, to cover the new team and his part of the crop. You can never cover too much in a C mortgage. Let it be eight per cent, due Oct. 1st next; cover the new team, other horses, his part of the crop—in fact, everything in sight that you can. Use your tact in the matter. If Sherwood is ready to pay the $125, make out the release and I will send it to you to see to release and I will send it to you to see to releasing the horses only if he is ready to pay & co. New note, eight per cent, due Oct. 1st, next. Fix the release for just the horses; I to send it to you. Then, when Sherwood pays you, you can have it in hand, so you may be able to see to the release. Use a little tact. You better not take a new mortgage and note of Purvine till all is closed up together, maybe. I am sorry to bother you with it. I have the bad cold and do not feel even quite as good as usual. Mae has the cold too, but is some better. You keep all over and beyond $100.00 from Sherwood if you get it closed up. Clara does not be at all well. I am, yours very truly, Pierce Riggs.

"P. S.—I do not appear able to figure it much. The team to Cy Purvine for two hundred fifty dollars, eight per cent interest since October 1st, 1916. If, now, Sherwood pays $125.00, Purvine would be owing me the difference, with the interest on the two hundred and fifty dollars, eight per cent, since October 1st, 1916, till it is closed up with him, with new note and mortgage. If Sherwood pays the $125.00, Purvine would then owe me the difference between two hundred and fifty and a hundred and twenty-five dollars, with 8% int. included on the $250.00 till the whole matter is closed up."

On March 8, 1918, he wrote to his nephew inclosing the chattel mortgage release and a copy of the ac-

count sent in by the tenant and a copy of a ledger account and so forth, giving directions in regard to management of the farm. On March 22d he wrote to his nephew in regard to renewing the lease of the farm giving details and showing great care and business capacity.

11. He complained to the nurse of his wife tipping the waiter ten cents on their California trip. This incident is one of the main reasons mentioned in the hypothetical question for the conclusion of eminent alienists that indicated that Pierce Riggs was childish and insane, particularly on account of the smallness of the transaction. This does not indicate a change in the mental attitude of Pierce Riggs. This is shown by a reference to his cash expense account beginning July, 1914. On August 1, 1915, we find in this account as follows: "Church — $.03 — Wife — $.10 — $.13," indicating that he had contributed to the church in which he took considerable interest, although not a member, the munificent sum of $.03. He also makes a record of furnishing his wife with the sum of $.10. On the 22d of that month he made a memorandum of an expenditure to "Church $.10, Paper $.05." Many other small items of the family expenses occurred during the month, the total being $189.30.

12, 13. A radical change in a person's habits and thoughts is evidence of insaneness of mind: *In re Faling's Estate, supra,* at page 446. In the consideration of the hypothetical question, the small matters, like the ten-cent tip, appear to have been assumed by the alienists who testified for contestant, to have marked a change in the thoughts and habits of Pierce Riggs. The hypothetical question propounded by counsel for contestant suggests such assumption. However, the record does bear out such a condition.

The evidence is clear that Pierce Riggs was always very miserly or stingy. It is not easy to find a word strong enough to express his trait in that respect. There had been no change in his thoughts or habits in this regard. Hence, the conclusions of the eminent alienists who pronounced him insane, were not founded upon proper facts and must be rejected.

The two principal witnesses to the will, B. Lee Paget and J. Purvine, both old intimate acquaintances of the testator and well-known business men of Portland, and whose veracity is unquestioned, testified to the execution of the will. Mr. Paget stated to the effect that Mr. Pierce Riggs informed him of the purpose for which he had asked him to come up to the office of Attorney Reynolds and witness the will, that he asked Mr. Purvine and himself to witness it; that Pierce Riggs signed the will and indorsed his name on each page of the document and he and Mr. Purvine witnessed it. Some conversation was indulged in on general subjects in which Pierce Riggs participated, and largely led; that he had witnessed dozens of wills and there was nothing at all unusual about the execution of this one; there was nothing about Pierce Riggs in his mental or physical condition to indicate anything more than just the ordinary execution of a transaction of that kind, as it is usually done.

The witness being interrogated as to when he was last with Mr. Riggs to consummate any business transaction, testified that it was in July, 1921. They were considering the making of a loan of $6,000 on property on the brow of the hill in Alameda Park. It was a new residence under construction and nearing completion. Mr. Seth Riggs took his automobile and the witness accompanied him. They went to Pierce Riggs' residence, where he joined them, and

then went to inspect the property. The amount involved was a little larger than usual. Pierce Riggs inspected the property; went all over it, upstairs and in the basement, and asked questions about it. The topography of the lot was an important feature because the view from the house was very beautiful. In regard to the question whether or not other buildings might be put up to hinder the view, he was very particular in asking about the lot lines, and corners, and inspecting for himself as to whether there was any danger as to that. After spending considerable time in making the appraisal, he decided the loan should be made and authorized the witness to conclude it.

That in such investigations decedent took the lead and as to the judgment and care used in that inspection he was keen and clear; that he was perfectly competent to exercise his judgment and physically equal to the task in hand; that from his personal acquaintance with Pierce Riggs, and what he knew and observed of him at the time of making the will, and on other occasions, to his mind, there was no question whatever but that he was perfectly sane at the time of making the will.

14. Mr. Purvine, a merchant of Portland, as a witness for proponents, testified he was reared in Polk County and had known Pierce Riggs practically all his life from about fifteen years of age on. His association was closer with him after 1892. Their relation was social and friendly, and in a business way. The witness moved to Portland in 1903 and Pierce Riggs moved to Portland about 1907 or 1908. About 1910 he moved to the witness' place and lived as one of the family, until he was married. They frequently talked over their business and advised each other. After Mr. Riggs was married he saw

him about once a week, or a month. Mr. and Mrs.
Riggs and the witness and family visited each other.
The witness saw him at the store very often, except
when he was in California. The witness never saw
any reason to suspect his memory was failing in
reference to anything. His business capacity was
very fine at any time while he had known Mr. Pierce
Riggs. Pierce Riggs knew good business risks or a
risk that was not paying. He often heard him talk
about his farm and property. He mentioned a piece
of property he owned was occupied by his wife's
father and mother; and often talked in respect to
straining his arm in raising or helping to raise "that
building."

When the will of Pierce Riggs was executed in Mr.
Reynolds' office, on receipt of a telephone call at the
store and a request to act as a witness, he went to
the office. Mr. Reynolds and Pierce Riggs were,
sitting there alone. They chatted a few moments and
Pierce Riggs said: "I am making my will," and
asked him if he would sign as a witness. They waited a
few minutes and Mr. Paget arrived. Pierce Riggs
signed the will. Mr. Paget, the witness, and John
W. Reynolds subscribed as witnesses. He did not
remember whether Seth Riggs was there or not.
He thought he was. The witness did not notice any-
thing out of the ordinary in Mr. Pierce Riggs'
physical condition. He appeared to be in his usual
health, but was never robust. From his acquaintance
and observation up to the time the will was executed,
he believed Pierce Riggs was of sound mind. That
he knew what he was doing and he never appeared
to him to be more normal in a business way than
at that time. He saw nothing to excite suspicion
that there was anything wrong mentally with Mr.
Riggs; that he saw nothing to lead him to think he

was not acting freely and voluntarily, or that any influence was being used upon him; that Pierce Riggs' will was very firm. He was not a man who could be easily controlled or influenced by other persons against his will. When he made up his mind he was firm and it would have been a hard matter for anyone to influence him against his will. That he had talked with Mr. Riggs time and again about a loan on some piece of property and the witness thought it might be a favorable loan. Pierce Riggs would study the matter over and would find something, perhaps the moral risk did not suit him, and he would reject it. He was very economical. He made his money by saving it and loaning it out. That these casual talks about business matters occurred as late as 1920. After Mr. Paget and Mr. Purvine had witnessed the will, Mr. J. W. Reynolds, the attorney who drafted the will, also signed as witness and testified as a witness in the case in regard to the details pertaining to the execution of the will. Several other witnesses testified as to the mental capacity of the testator. We think the testimony of proponents establishes the capacity of Pierce Riggs, the decedent, to make a will at the time the will in question was executed.

Mrs. Riggs was a kind and dutiful wife of the decedent. Nevertheless for some reason there was not that close union that should prevail between husband and wife. We think the reason is explained in the difference in their ages. She was a member of the Adventist Church. He was not. The relatives of Mrs. Riggs, her father and mother, did not seem to cement their union. Little acts of kindness on the part of Mrs. Riggs toward her father and mother, such as sending them tastes of food, did not appear to be appreciated by Mr. Riggs. The ex-

penditures of the husband for the wife were curtailed to a small limit. Even on their honeymoon trip to California his account shows four meals—ninety cents. After the death of Mrs. Riggs' mother it became necessary for Mr. Riggs to refuse to allow her father to make his home at the Riggs' residence. The reason given appears to have been that as Mr. Riggs was in poor health and nervous, the presence of his father-in-law, who was of a different religious faith, and the liability of argument between them would not be conducive to Mr. Riggs' welfare.

The testimony indicates that Pierce Riggs for some time entertained the idea that he did not want his hard-earned fortune to go to the Elwood family, or to the Adventist church, but that he desired the larger portion thereof to remain in the Riggs' family. There is some reason to believe that as he expected Mrs. Riggs to outlive him, which she did for a short time, he did not want his money to enrich another man's purse.

F. H. Hilton, an attorney of Portland, did some business for Pierce Riggs in connection with his loans and the foreclosure of mortgages and advised with Pierce Riggs in regard thereto. Mr. Hilton testified, as a witness in the case, to the effect that his services for Mr. Riggs began in December, 1917; that there was a suit over some property and that Pierce Riggs understood about the nature of the proceedings brought against tenants. There were two foreclosure suits that he brought as attorney for him. He met him in his office and had some conversation with him and also once at his house, and Pierce Riggs understood as to the foreclosure and knew the details thereof. In one or two instances it was a case of whether he wanted to give more time. After he obtained the deed by virtue of the

foreclosure, Mr. Riggs appreciated the fact that he had a deed and the property was his. The question arose as to whether he should give the property back and forego the profit arising from the increased valuation of the real estate. One suit was filed some time in 1918. After he had a deed to the property the matter was closed by deeding the property back for what was due. In another foreclosure there were complications in regard to liens against the property which had to be settled. The property was taken over by a third person and Pierce Riggs made an assignment of sheriff's certificate. The witness further testified:

"Q. Did you have any conversations with Mr. Pierce Riggs at any time, in which the course of descent of property or a will was mentioned?

"A. At one time * * I can't fix the date * * these things are all rather indistinct in my memory as to the exact time when the talk was had,—but it is my recollection, and I am sure that my recollection doesn't fail me in this regard—that Mr. Riggs did speak to me one time about the making of a will. He came into the office, as I recall it, and was talking and wanted to find out something about the laws of descent and distribution, and about leaving his property to the parties to whom he wanted it to go.

"Q. Did he express any intention or opinion on the subject of where his property should go, or where he intended it to go?

"A. His idea seemed to be at that time that he wanted his relations to get some of his property, and get a share of the property, or a substantial part of it. I don't recall exactly—I wouldn't undertake to say exactly what he said, because it is so long ago that I can't remember; but I do know that the general idea that he conveyed to me was that he wanted his relations to come in for the property, or a large share of it, and that is why he wanted to find out

about what would happen if he died and had not made provision for them.

"Q. Did he, at that time, take any steps looking to the preparation of a will?

"A. Not with me. It was simply sort of fishing around, so to say."

Dr. Kelsey examined Pierce Riggs five or six times during his breakdown. He states in answer to a question:

"A. They talked to me about the history of a paralytic stroke some five or six years before, and I noticed that his left arm was weak, and that his left leg was somewhat affected, but not much."

15. There is no direct testimony that Seth Rriggs, or any member of the Riggs' family, or anyone else, exercised any undue influence upon Pierce Riggs in the making of his will. The most that can be thought from the testimony is that some of the beneficiaries of the will had an opportunity to attempt to exert such influence. It is not sufficient to show mere opportunity to exercise undue influence: *Rice* v. *Rice,* 95 Or. 559, 563 (188 Pac. 181); *Rowe* v. *Freeman,* 89 Or. 428 (172 Pac. 508, 174 Pac. 727); *Sturtevant's Will, supra.*

There is some testimony which it is claimed indicates that Seth Riggs advised his brother Pierce Riggs that he could make a will and divide his property into shares for convenience in so doing. There is nothing to indicate that Pierce Riggs did not already know of his right in the matter just as well as Seth Riggs. They seemed to have talked the matter over at the instigation of Pierce Riggs just as they did their other affairs. There is not a scintilla of other testimony tending to show that Seth or anyone ever indicated or suggested in any way how Pierce Riggs should dispose of his property.

16, 17. Undue influence is not ordinary influence. It must be such as to overcome the free volition or conscious judgment of the testator and to substitute the wicked purposes of another. Suggestion or advice by a friend or relative, or one in confidential relation, is not undue influence, if it leaves the mind free to act on its own judgment: 28 R. C. L. 137–154; *Darst's Will*, 34 Or. 58, 65 (54 Pac. 947); *Pickett's Will*, 49 Or. 127, 153 (89 Pac. 377); *Holman's Will*, 42 Or. 345, 358 (70 Pac. 908); *Dale's Estate*, 92 Or. 57, 64 (179 Pac. 274); *Estate of Allen*, 116 Or. 467 (241 Pac. 996). There is shown no more than a suspicion on the part of contestant of undue influence. The mere fact of his making a will would not prevent him from making such provisions therein for his wife as he saw fit. The whole testimony shows that he made such provisions in his will, as he freely and voluntarily intended and desired. He understood the business in which he was engaged in making his will. He knew his property and remembered all those who had a natural claim upon his bounty, and he firmly knew how he wished to dispose of his property. He expressed his own free will in the document proffered for probate. However strongly we may believe that the testator was unjust in the disposition of his fortune in the provision for his wife, the court cannot make a will for him or correct the one legally made. Under the provisions of the will the executor offered Mrs. Riggs $8,000 in lieu of her dower. Doubtless this property right looked large to Pierce Riggs when we remember his view of a ten-cent tip to a waiter and his contribution of three cents to the church, and his general parsimony: *Potter* v. *Jones*, 20 Or. 239 (25 Pac. 769, 12 L. R. A. 161); *Holman's Will, supra; Ames' Will, supra; Turner's Will*, 51 Or. 1 (93 Pac.

461); *Beakey* v. *Knutson,* 90 Or. 574 (174 Pac. 1149, 177 Pac. 955); *Dale's Estate,* 92 Or. 57, 67, 70. (179 Pac. 274); *Phillips' Will,* 107 Or. 612 (213 Pac. 627, 628).

We conclude that the will of Pierce Riggs, deceased, executed on May 17, 1919, was his valid last will and testament and that it should be admitted to probate as such.

The decree of the lower court is reversed and the cause will be remanded, with directions to take such proceedings as may be necessary and proper in accordance with this opinion.

No costs will be awarded appellant in either court.
REVERSED AND REMANDED.  REHEARING DENIED.

BURNETT, RAND and COSHOW, JJ., concur.