Proceeding to caveat a will upon the ground:
1. That the paper-writing offered for probate was not executed as required by the statute in that the subscribing witnesses did not attest it in the presence of the testator.
2. For that the testator did not have sufficient mental capacity to enable him to make a will.
3. For that the execution of the will was procured by undue influence.
It was admitted upon the trial that the testator did have sufficient mental capacity, and this ground of objection to the paper-writing as a will was abandoned by the caveators.
The testator was blind and the evidence as to the execution of the will is as follows: *Page 204 
R. D. Critz testified: At the time of the alleged execution of this will I lived within a mile and half of H. V. Allred. In consequence of request I went to Mr. Allred's house 27 March, 1905. He told me he wanted me to write his will for him, when I got there. He told George Allred to go and get Mr. Wolfe to witness it. I wrote the will. I wrote the will in accordance with what he told me. I first read the sections to him, and after I got the whole will wrote I back and read it all over to him. He said it suited him; that was the way he wanted it. Mr. Wolfe came. I might have started the will before Wolfe came, got the form written, before he got there. He was there at the time these bequests were made. Mr. Allred was blind. I wrote his name and then held the pen and took his hand and placed it on the pen and made his mark that way. Mr. Wolfe was standing there present. Mr. Wolfe and myself signed as witnesses. I signed the witness as a subscribing witness at his request. Mr. Wolfe did, too. We were in the presence of each other and in the presence of Mr. Allred. He knew that we (155) both signed the will there in his presence as witnesses. After the will was signed and witnessed, he told his son George to take it and put it away for him. H. V. Allred, in my opinion, had sufficient mental capacity to understand what property he was disposing of, the persons to whom he was giving it, and the purpose for which he was disposing of it. Subsequent to this I was called upon to write a codicil to his will, on 31 May, 1909. He sent for me and I went to his house and wrote the codicil. When I got there he sent his son George to get Mr. Pete Beamer as a witness, and while he was gone I wrote out the codicil and was waiting for him to come before I read it over to Mr. Allred. Then we both signed it as witnesses. Upon its completion I then wrote Mr. Allred's name. I took his hand and placed it on the pen and he made his mark. Mr. Beamer was there in his presence and in my presence. At that time his mental condition was good. He was sitting there by the fire. I did the writing about four feet from him; he was in front of the fire and I was to one side. I used a table to write on; it was already in the room when I got there. I read it all over to Mr. Allred. Mr. Allred had hold of the paper. I laid the paper on his lap. He signed it on his lap. It was ten or fifteen minutes after I wrote that he signed it. During that time I had the paper in my hand. I read the first will over to Mr. Allred in sections as I read it; then I read it all over to him. I was between him and the table. He did not sign on the table; I laid it down on his lap; I held to the pen and he held to the staff. I did not witness it at the same time I wrote his name. I did not sign it on his lap. No, sir. After he signed it on his lap, four or five feet from me, I turned and laid it on the table and signed it. My face was west and his was east. If his eyesight had been good he could have *Page 205 
seen me sign it. I was a little farther back. When the other witness signed it, Mr. Allred was at the same place. I was standing right there looking at the witness when he signed. I got up and let him sit down at the table. I stood right behind him and saw him sign it.
The caveators contended upon this evidence that as the paper-writing was signed by the testator while it was resting in his lap and was then taken by the witness and placed on a table about four feet from the testator but in the same room, and there subscribed by the witnesses with their backs to the testator, that this was not a compliance with the statute requiring the paper-writing to be subscribed by the witnesses in the presence of the testator, and they presented this contention by several prayers for instructions, which were refused, and they excepted.
The testator left surviving him six sons, three of whom are the principal beneficiaries under his will, and the caveators offered evidence tending to prove that one of these sons had never married and had lived with his father and mother and for twenty years had had charge of his farm and had managed his business, and that during the last six years this son and the other two sons who were beneficiaries under (156) the will had had control and management of his business.
The caveators requested his Honor to charge the jury as follows:
"When one is the general agent of another and has entire management of his affairs, so as in effect to be as much his guardian as the regularly appointed guardian of an infant, a presumption of fraud, as matter of law, arises from a transaction between the agent and his principal for the latter's benefit, and it will be decisive of the issue in favor of the principal unless rebutted."
This prayer was refused and the caveators excepted.
The caveators also excepted for that his Honor, in his charge to the jury upon undue influence, stated that it must be an influence "exercised upon the minds of Mr. Allred at the time of the making the will."
There was a verdict in favor of the propounders, and from the judgment rendered thereon the caveators appealed.
The right to dispose of property by will is a creature of statute and it is generally provided when the paper-writing offered for probate is not in the handwriting of the testator that it shall be attested by witnesses, who are required to subscribe the same in the presence of the testator.
There was at one time a disposition to give a restricted meaning to the term "in the presence of the testator," and to hold that it meant "in *Page 206 
the sight of or within the scope of the vision," but as it was soon seen that this narrow construction would prevent a blind man from making a will and that it excluded the operation of the other senses, except that of sight, a broader and more liberal construction has been generally adopted, and it is now well settled that a blind man may know of the presence of the witness without sight and that he may make a will. Bynum v. Bynum,33 N.C. 632; Underhill on Wills, Vol. 1, 267; Ray v. Hill,28 S.C. 302; Reynolds v. Reynolds, 24 S.C. 253; Riggsv. Riggs, 135 Mass. 238.
"In the case of a blind man the superintending control which in other cases is exercised by sight must be transferred to the other senses." Rayv. Hill, 28 S.C. 304.
"He must first be made sensible through his remaining senses that the witnesses subscribed in his presence." Reynolds v. Reynolds, 24 S.C. 256.
"It is true that it is stated in many cases that witnesses are not in the presence of the testator unless they are within his sight; but (157) these statements are made with reference to testators who can see. As most men can see, vision is the usual and safest test of presence, but it is not the only test. A man may take note of the presence of another by the other senses, as hearing or touch. Certainly if two blind men are in the same room, talking together, they are in each others presence. . . . In cases where he has lost or cannot use his sense of sight, his mind is not affected, if he is sensible of what is being done, if the witnesses subscribe in the same room, and within his hearing, they subscribe in his presence." Riggs v. Riggs, 135 Mass. 241; 1 Underhill, p. 267.
A notable instance of the execution of a will by a blind man is that of Francois Xavier Martin, who, after he left this State, was for thirty-one years a member of the Supreme Court of Louisiana, and during the last eight years of his service he was totally blind. His will was contested by the State upon the ground that a blind man could not make a will and also because of an alleged illegal trust, but was sustained. S. v. Martin, 2 La. An., 667.
Mr. Underhill, in his work on Wills, Vol. 1, sec. 196, gives the reasons for the requirement of the statute and states how it may be complied with by one who cannot see. He says: "Many of the statutes regulating the execution of wills require that the witnesses shall subscribe their names `in the presence of the testator.' The purpose and object of such statutory regulations are to enable the testator to see that the very persons whom he has requested to attest his will do in fact attest it, and also to prevent wicked and interested parties from substituting in the place of the paper which he has subscribed as his *Page 207 
last will, another paper of which he knows nothing. Presence in its widest meaning is the antonym of absence. Hence, where the statute requires a signing by witnesses in the presence of the testator subscription to a will by the witnesses in the absence of the testator is absolutely void. Nor can such a fatal defect be remedied by a subsequent acknowledgment by the witnesses of their signature, uttered in the presence of the testator. The requirement that the will shall be signed by the witnesses in the presence of the testator does not prescribe that he shall actually see the witnesses sign the will, provided they do in fact sign it in his presence. The validity of the execution of a will cannot be made to turn upon the ability of the testator to see; for, if such were the law, it is clear that no blind man could execute a valid will. Therefore, while his intellect and hearing remain unimpaired, and he is conscious of what he is going on about him, an attestation in the same room where he is, or in such proximity in another room as to be in the testator's line of vision, provided he could see, and within his hearing, will be sufficient signing in his presence."
It is not contended by the caveators that the witness did not (158) in fact sign the same paper that was signed by the testator, and if these principles are applied to the evidence we are of opinion that the will has been properly executed, as the witnesses were only four feet from him and he had the opportunity of knowing that they were signing the paper which he had signed, by the sense of hearing, and the witnesses say he knew that they signed the will there in his presence.
The principle contended for by the caveators that a presumption of undue influence arises as to transactions between a confidential adviser and general manager and the person whose agent he is, is very generally applied, but there is highly respectable authority for the position of the propounders that it only prevails as to gifts and conveyances inter vivos
and should not obtain as to testamentary dispositions. Lee r. Lee,71 N.C. 145; In re Hurlburt, 48 N.Y., App. Div., 91; Bancroft v. Otis, 24 A.S.R., 908.
In the last case cited there is a learned and instructive discussion of the question by Justice McClellan, of the Supreme Court of Alabama, which he concludes as follows:
"The doctrine of presumed undue influence against the dominant party, in transactions inter vivos, seems to us eminently sound and just. It proceeds, primarily, upon the natural assumption that a living person, having, it is to be supposed, a need for his property, or at least a desire to retain it, during life, will not part with it without a measurably adequate equivalent. Where it is made to appear that he has given it away, and that to one who occupies a position of domination in relation to him, the presumption still is that he has not freely *Page 208 
deprived himself of it and its use and enjoyment, but that his act was induced by the undue exercise of the influence which the beneficiary is shown to have had over him; and this presumption must be met by the donee and rebutted, else, in equity, it becomes as a fact proven — a vitiating fact in the transaction. With respect to testamentary dispositions, the primary presumption upon which the whole superstructure of the doctrine of presumed undue influence in contracts and gifts intervivos rests is entirely lacking. They take effect upon the death of the donor. They involve in no deprivation of use and enjoyment. There can be, with respect to them, no assumption that the donor would not voluntarily part his property, since in the nature of things it must then pass from him to others selected by himself according to the dictates of his affections, are appointed by the law of descents and distributions; and in either case without consideration moving to him. It is not out of the usual course of things, but in accordance with the exigencies of mortality, that the property should cease to be his, and should become that of another. And the very considerations which lead to suspicion, (159) which must be removed in transactions inter vivos — friendship, trust and confidence, affection, personal obligation — may, and generally do justly and properly give direction to testamentary dispositions."
The authorities are also more insistent against allowing this presumption to prevail when the confidential agent is the son of the testator. Berberet v. Berberet, 52 A.S.R., (Mo.), 640; Eastis v.Montgomery, 93 Ala. 299; Dale's Appeal, 57 Conn. 144; Huffman v. Groves,245 Ill. 445; Bundy v. McKnight, 48 Ind. 516; Marshall v. Hanby,115 Iowa 322; Furlong v. Carraher, 108 Iowa 493; In re Smith's Will,95 N.Y., 522; In re Hurlburt, 48 N.Y., App. Div., 91; Friend's Estate, 198 Pa. St., 363; Hook's Estate, 207 Pa. St., 207; In reMason's Will, 82 Vt. 165; 40 Cyc., 1152.
Mr. Underhill, vol. 1, sec. 145, says of this presumption: "If the testator is well advanced in years and has grown-up sons, it is almost certain that he has, prior to his death, intrusted the management of at least a portion of his estate to one of them, who, by reason of the power and control over the property of the testator thus delegated to him, occupies a position of marked trust. Can it be said that a son who, under such circumstances, received a large portion of his father's estate to the exclusion of another son, who has never manifested any ability or even inclination to care for the interests of his father, is called upon to show that he has not procured his legacy by fraud and undue influence? Or is the legal adviser of the testator, by whose industry, experience and skill his property has perhaps been protected from the assaults of those who by fraud and trickery have endeavored to deprive *Page 209 
him of it, called upon to rebut a presumption of undue influence because, promoted by gratitude and appreciation of his efforts, the testator has, out of a large estate, left him a small legacy? Such is not the rule that comments itself to the sense and reason of mankind."
We would be slow to admit that the presumption of fraud or undue influence prevails in a case like this where the testator was old and blind and unable to attend to his business and when the son, in the performance of a natural and moral duty, remained with him and looked after his business as he ought to have done, but it is not necessary for us to pass upon the question, because at most it could only raise a presumption of fact which would entitle the caveators to have the question submitted to the jury, and they asked his Honor to charge the jury that it would be decisive of the issue.
In Furniture Co. v. Express Co., 144 N.C. 644, the Court said: "It may be well to note here that in using the terms prima facie and presumptive, the terms do not import that the burden of the issue is changed, but that on the facts indicated the plaintiff is entitled to have his cause submitted to the jury under a proper charge as to its existence or nonexistence and of the effect of any presumption (160) which may attach," and in Currie v. R. R., 156 N.C. 424, "When the presumption is treated as one of fact the rule usually obtains that the evidence must be submitted to the jury and they must pass on its sufficiency."
The authorities in support of this position are collected in this last case and in S. v. Wilkerson, 164 N.C. 436.
If the prayer had been given as requested, nothing would have been left for the determination of the jury and it would have amounted to a direction by the judge to answer the issue in favor of the caveators, when, if the position of the caveators could be sustained, that a presumption of undue influence arose, this presumption was only evidence of the fact which would have to be passed on by the jury. We therefore conclude that there was no error in refusing the prayer for instruction.
The criticism upon the statement in the charge that the undue influence must be exercised at the time of the execution of the will would be well founded if it did not appear from the context that what his Honor meant was that it must be operative at that time, and it must have been so understood by the jury.
We have carefully considered the exceptions and find
No error. *Page 210