Argued March 11; reversed September 4; rehearing denied
December 16, 1930

IN RE WAYNE'S ESTATE
WAYNE *v.* HUBER
(291 P. 356, 294 P. 590)

*W. Lair Thompson* and *Lawrence A. McNary,* both of Portland (Lawrence A. McNary, McCamant & Thompson, Ralph H. King and Edward J. Clark, all of Portland, on the brief), for appellant.

*John W. Kaste* of Portland (C. T. Haas and Barge E. Leonard, both of Portland, on the brief) for respondent.

BROWN, J. The will reads as follows:

"Know all men by these presents, that I, Charles E. Wayne, of Portland, Multnomah county, Oregon, being of sound and disposing mind and memory, do make, publish and declare the following as my last will and testament, hereby revoking all former wills by me made; that is to say:

"First: I direct that all my just debts be paid.

"Second: I direct that I be buried in the I. O. O. F. cemetery near Fort Jones, Siskiyou county, California, beside the body of my former beloved wife, Nellie Carlock Wayne; that my name be engraved on the tombstone beside that of my said former wife, and that a headstone be placed at my grave similar to that on hers.

"Third: I give and bequeath to my friend, Nellie K. Mathews, of Yreka, California, the sum of five hundred dollars, to be paid to her mother, Katherine Mathews, of the same place, and to be used at said mother's discretion for the education of said Nellie K. Mathews.

"Fourth: I give and bequeath to my friend, Anna W. Cowan, of Sacramento, California, all money owing to me by her at the time of my death, if any.

"Fifth: I give and bequeath to my friend, Winnifred Carlock, cousin of my beloved former wife, Nellie Carlock Wayne, the sum of five hundred dollars, in

trust nevertheless, without bonds, to be used as she sees fit for the education of her son, Leslie Edward Carlock.

"Sixth: I give and bequeath to the Fort Jones Lodge, No. 115, Independent Order of Odd Fellows, at Fort Jones, Siskiyou county, California, the sum of one thousand dollars, in trust nevertheless, to be invested in safe security and to the best advantage by said lodge, and the interest accruing thereon to be expended by said lodge in keeping in good condition and repair the Adam B. Carlock lot in what is known as the I. O. O. F. cemetery near Fort Jones where my said beloved first wife is buried, the said Adam B. Carlock, my father-in-law, having been a charter member of said Fort Jones I. O. O. F. lodge, and I direct that said interest and income from said bequest be used to keep said lot in good repair, the rodent holes, if any, filled, and otherwise kept in presentable condition, and for flowers to be placed upon the graves in said lot each and every Memorial Day in May.

"Seventh: I give and bequeath to my wife, Mattie V. Wayne, the sum of four thousand dollars, which shall be taken, received and accepted by her in lieu of her dower interest in my estate, and in the event that she shall not accept the said bequest in lieu of her dower, then the same shall go to my residuary legatee and devisee.

"Eighth: I hereby certify and declare that I have no child born or unborn, or children living, and if any person claims to be my child, and makes proof of such relationship, I give and bequeath to such person or persons the sum of five dollars each.

"Ninth: It is my will that if any person, or any legatee under this will, shall contest the validity of this will, or any of its provisions, such person or persons shall forfeit the right to any legacy under the will, and to all interest whatever in my estate.

"Tenth: All the rest, residue and remainder of the property of which I die possessed, whether real, personal or mixed, I give, bequeath and devise to my

niece, Mrs. Lenna Huber, of 998 E. 15th street North, Portland, Oregon, and I appoint my said niece executrix of this my last will and testament, and direct that she be authorized to act as such without bond.

"In witness whereof, I have hereunto set my hand and seal this 22d day of December, 1927.

"(Signed)     Charles E. Wayne     (Seal).

"The above instrument was signed, sealed and declared by the said testator, said will consisting of this and one other page, page 2 of will signed 'Charles E. Wayne,' to be his Last Will and Testament, in our presence, who at his request, and in his presence, and in the presence of each other, have subscribed our names as witnesses hereto.

"(Signed)     Edgar M. Adams,
Residing at Portland, Oregon.
"(Signed)     Irwin R. Miller,
Residing at Portland, Oregon."

The contestant grounds her petition upon the alleged undue influence exercised by Lenna Huber, the testator's niece and principal beneficiary under his will, in the matter of the testamentary disposition of his property. She asserts that the will is not the will of Charles E. Wayne, but that it is the product of the mind of Lenna Huber, and that Wayne in fact died intestate.

■ The law casts upon a litigant alleging undue influence the burden of proving it. II Alexander, Commentaries on Wills, § 593; I Underhill on the Law of Wills, § 128; Rood on Wills (2d Ed.), § 189; *Simpson v. Durbin,* 68 Or. 518 (136 P. 347); *In re Sturtevant's Estate,* 92 Or. 269 (178 P. 192, 180 P. 595); *Rice v Rice,* 95 Or. 559 (188 P. 181); *In re Estate of Moore,* 114 Or. 444 (236 P. 265); *In re Estate of Allen,* 116 Or. 467 (241 P. 996); *In re Severson's Estate,* 125 Or. 545 (267 P. 396).

■ In this state, the law relating to the subject of undue influence is well settled. See *Rowe v. Freeman,* 89 Or. 428 (172 P. 508, 174 P. 727); *In re Sturtevant's Estate,* supra, and *Rice v. Rice,* supra, where this court held that, to establish undue influence it was not enough to show mere opportunity to exercise undue influence over the mind of a testator. The case of *Carr v. Ryan, Executrix,* 121 Or. 574, 582 (256 P. 390), is more far-reaching in effect than those just cited. In rendering its decision in that case, the court said:

"Friendly advice or influence arising from gratitude, affection or esteem is not undue influence, nor can it become such unless it destroys the free agency of the testator at the time the instrument is executed: *Estate of Allen,* 116 Or. 467, 499 (241 P. 996)."

In *Riggs v. Riggs,* 120 Or. 38, 63 (241 P. 70, 250 P. 753), the subject is treated in the following language:

"Undue influence is not ordinary influence. It must be such as to overcome the free volition or conscious judgment of the testator, and to substitute the wicked purposes of another. Suggestion or advice by a friend or relative, or one in confidential relation, is not undue influence, if it leaves the mind free to act on its own judgment (citing 28 R. C. L., 137-154, and a number of Oregon cases)."

The contestant relies largely upon the case of *Greenwood v. Cline,* 7 Or. 17, a case which presents an altogether different setting of facts. In that case the appellant's petition alleged, and the evidence proved, that the testatrix at the time of making her will was not of sound mind; and, further, that in consequence of old age and other causes, her mind was seriously impaired and shattered, her memory destroyed, and that her mental condition was such that she was easily persuaded in her course of conduct. In the instant case,

there is no contention that the testator was not of sound mind. Furthermore, a number of witnesses, among them well-known attorneys, have testified that the testator was a man of intelligence, very firm in his opinions, and that, when he had made up his mind on any particular matter, it was with great difficulty that he was swerved.

On the subject of the burden and sufficiency of proof to establish undue influence, Rood on Wills (2d Ed.), at section 189, says:

"It cannot be presumed from the mere fact that the principal legatees had both the motive and the opportunity to exercise undue influence; nor from the additional fact that the will is unreasonable and unjust.   *   *   *

"Concealment of the fact of making the will raises no presumption."

See, also, *Miller v. Jeffery,* 129 Or. 674 (278 P. 946).

In her attempt to establish the allegation that this will was the result of undue influence, the contestant seems to rely chiefly upon declarations asserted to have been made by the testator relating to his associations with the principal beneficiary, and, in addition, declarations by third persons, some of which were made after the death of Mr. Wayne. This evidence was received over the objection of the contestee, and she, in turn, offered some competent, and many incompetent, declarations of testator in support of the will. As illustrating the nature of declarations adduced to establish the substantive fact of undue influence, we set out the following excerpts from the record:

Nettie B. Wayne, wife of Fred Wayne, a brother of testator, testified that she visited Mr. and Mrs. Charles Wayne in their Portland home about a week in October,

1925; that while she was there a Mrs. Holland called to see her and "she (Mrs. Holland) began to tell me that Mrs. Wayne was not just what I might think she was—that she (Mrs. Wayne) was jealous of Mr. Wayne's relatives, Lenna and Ada, and that she (Mrs. Wayne) was trying to keep Charles away from them as they had been very close to him; and she (Mrs. Holland) also stated that she (Mrs. Wayne) was even jealous of her, and that she just married him for his money. And there was other things said, but as to testifying to them I could not do so because I don't remember what they were word for word. But those things I do remember." Later, in the course of a conversation with Mrs. Sharp, this witness told her what Mrs. Holland had said, and told her "how surprised I was, because Mrs. Wayne had made a very favorable impression on me at that time; and she said, 'Yes'; she said that she (Mrs. Sharp) told Anna (Mrs. Holland) to tell me those things, and just what she (Mattie Wayne) was." Concerning a conversation that took place after Mr. Wayne's death, this witness testified as follows:

"Q. Now, who suggested or stated that there might have been foul play, and that they should have an autopsy? A. Well, in that case, I don't like to mention names, because I really don't remember just which one said it.

"Q. Were both present at the house? A. It was talked of quite a bit in Mr. Wayne's presence and in my presence.

"Q. What foul play did they suggest might have taken place, if anything? A. Oh, I think poison was the only thing suggested. * * *

"Q. Who was talking there at that time, at Lenna Huber's? A. Mrs. Huber and her mother were talking about it.

"Q. Who did they refer to when they suggested someone might have poisoned him? A. Why, they referred to Mattie.

"Q. Was there anything said about how the poisoning might have taken place? A. Oh, they said, 'Well, she could put it in his soup, or coffee, or something like that.' "

Concerning a telephone conversation with Ada Sharp, mother of Lenna Huber, and a sister of Charles E. Wayne, the contestant testified:

"The day before Mr. Wayne and I were married, * * * I called his sister, Mrs. Sharp, to tell them goodbye, * * * and she said, 'There have been four second disastrous marriages in our family,' and she says, 'I don't know about it.' I said, 'You don't mean to say I am marrying your brother for his home, or his money, do you?' She said, 'I don't know.' "

She testified that two or three weeks after they returned from their honeymoon, when she had finished a general housecleaning they invited Lenna Huber and her husband, and Mrs. Sharp who made her home with Mr. and Mrs. Huber, to Sunday dinner; that when they arrived Mr. Wayne, the testator, and Lenna Huber went upstairs where Lenna removed her wraps, and that they visited there until they were called to dinner some half hour later; that, after dinner Lenna's husband went to his restaurant to prepare vegetables for the following morning, whereupon Lenna, Mrs. Sharp, Mr. Wayne and herself went for a ride; that, when they were ready to start, Mr. Wayne put Lenna in the front seat with him and "told me to get in the back seat with Ada"; that, when they got back from the ride, he said to her, "You and Ada can get out. I want to take Lenna home"; that she asked him why, and he said he had something to say to Lenna; that he then took Lenna home, and later both of them took Mrs. Sharp

to the Huber home. She testified that, some time after her marriage with Mr. Wayne, Lenna Huber was taken to a hospital where she underwent an operation, and that Mr. Wayne employed a special nurse for her, and made various calls at the hospital, and that when she (contestant) asked him what the operation was he would never tell her; that he said it was a matter wholly between Lenna and himself, and "it was none of my business." However, Mrs. Anna J. Holland, a nurse, who cared for Mrs. Huber a part of the time after the operation, testified that the operation was for "the removal of cyst tumors and appendix." Her testimony continues:

"Q. And did Mrs. Wayne ever come to the hospital when you were there? A. Yes, she was there most every day.

"Q. And did Mr. Wayne come up? A. Yes, quite often.

"Q. And did Mrs. Wayne ever bring any flowers to the hospital? A. Yes, sir, she did.

"Q. Describe her attitude toward Mrs. Huber at that time. A. It was very affectionate at that time, and interested. I am sure that she knew of the operation also."

With respect to the testator's continued associations with Lenna Huber and the alleged consequences thereof, contestant testified in substance, that, every time he would go to Lenna's and come back, he was sulky and wouldn't eat with them, and that he would sometimes go up to his room, get an eiderdown comforter, take it out to the garage and wrap himself in it and sleep in the automobile. She continues:

"Finally he would tell me that Lenna said I only married him for his money, and that she said I was apt to poison him. * * * Once when he came back

from there he was so terribly exercised; he said Lenna said that I had only married him for his money, and he said, 'I thought that the other women were after my money, but I believe maybe you were too.' He said, 'Our marriage contract don't mean anything.' "

She testified that, many times after July, 1927, he told her that Lenna told him she was afraid Mattie would poison him; that he said Lenna kept calling him all the time and that she was doing everything she could "to keep us apart, and she wanted him to go away. She was afraid that I would poison him." She stated that, some time after July, 1927, when she was living at her former home, Mr. Wayne had a sick spell, and she went over to see him and found that Lenna had just left. The next day Mattie went over again, and Charles told her that Lenna said if she had been there Mattie "would never have gotten in the house" the day before. On this second day, Mattie cooked a dinner and took it over for Charles and Mr. Foster who was then staying with Mr. Wayne, and Charles afterward told her that Lenna said to him, "I should think you would have been afraid to have eaten it," and that Lenna was "always cautioning him about me poisoning him." From the time he returned from California in January, 1928, he told her they were doing "everything they could to keep him away from me." She said, "I told him he promised he would stay away from them, and he said, 'Lenna keeps calling me all the time about Ada's health.' " She testified that she went to California in July, 1928, and when she returned the first of August, he said:

"I have realized that she (Lenna) is the cause of all my trouble, and I have absolutely proved to you and to the world that I have stayed away from her."

He said he had absolutely stayed away from her, "and I found out he had." Her testimony continues thus:

"Q. Did he want you to come back to 805 Thompson street? A. And I had told him I would as soon as he stayed away from Lenna. He said he would prove to me and to the world that he would.

"Q. Well, did he prove it. A. He did. * * * Yes, it took quite a while. He said she kept calling him all the time; she did everything she could to keep us separated; she wanted him to go away; she wanted to keep us apart; she told him he was a d—— fool to come over there."

Samuel F. Evans, a nephew of testator, paid a call at the home of Lenna Huber about May 20, 1928; and, concerning a conversation had with her on that date, he testified:

"Lenna and I were in the kitchen * * * and I remarked, 'I wonder if Aunt Mattie and Uncle Charles would go together again.' And Lenna said, 'I hope not.' I said that if I thought they would go together and be happy and live a serene existence together, that I approved of it. Lenna said, 'No one could be happy with that woman, and I'll do everything I can to prevent their going back together again.' "

Theresa Kelly, daughter of contestant, testified that "one particular time" she heard "daddy" tell her mother that he had been up to Lenna's; that Lenna had told him that "mother" did not love him, but that she had just married him for his money. She also testified that, when the divorce papers were served on him, he begged Theresa to go to her mother and ask her not to go through with the divorce, that he wanted them all to stay with him; that, in addition, he went over to her mother's house and pleaded with "mother" to go back, stating that he would never mention it again, and they

would all be happy. She testified that, after coming home from Lenna's, Wayne would ask her mother if it was true that she would put poison in his soup or coffee, and that he would say, "Well, they have been telling me that," and "I don't know what to believe."

Emma D. Evans, a sister of testator, testified that, during the noon hour of a former trial, Lenna Huber stated in the presence of her son, Samuel Evans, Mrs. Sharp and herself, "I admit this will was very unjust." This testimony is corroborated by that of Samuel F. Evans.

Proceeding now to the time of the burial of testator at Fort Jones, California, it appears that for some time before the funeral Mrs. Sharp was a guest at the home of Mrs. Evans, her sister, near Fort Jones. Mrs. Evans testified that while Mrs. Sharp was there she (Mrs. Evans) handed her a funeral notice and asked if she would see that it was published; "so she (Mrs. Sharp) took it and held it in her hand, and while looking at it, after she read it she said: 'Poor brother! Murdered! Murdered! Murdered!' And I says, 'Why, Ada! Why do you talk that way?' She says, 'Mattie Wayne is Charles Wayne's murderer.' "

Concerning this phase of the case, the testimony of Fred S. Wayne, a brother of the testator, reveals the following conversation which took place in the home of Lenna Huber soon after the death of testator and before they had started for California:

"Q. State what you heard (at the Huber home), and by whom it was related. A. Well, my sister was— suggested the fact that my brother might have died through poisoning, that there was foul means there; and I asked if an autopsy had been held; and my sister, Mrs. Sharp, spoke up and she says, 'One should be held by all means, because it may be that there is foul play.' "

The law concerning declarations made by a testator has often been announced by text-writers and courts. In that connection, we note the following expression from Rood on Wills (2d Ed.), § 188:

"Declarations made by the testator to the effect that the will was procured by undue influence, or as to any other reason why he made it so, are usually considered mere hearsay and incompetent, except when made as a part of the *res gestae,* or offered for the purpose of showing the condition of the testator's feelings."

In 4 Jones, Commentaries on Evidence (2d Ed.), § 1615, with respect to declarations as substantive evidence of fraud, the author wrote:

"Except where part of the *res gestae,* declarations of the testator afford no substantive proof of fraud, duress or undue influence, and are not admissible for such a purpose. To establish fraud or undue influence, there must be independent proof and evidence exclusive of such declarations. If the statements are mere recitals of facts, and there is no independent proof of undue influence, they are, of course, pure hearsay and inadmissible. But, on the other hand, if it appears that the particular declarations were made at the time the fraud or undue influence was being effected, such declarations might be admissible, in proper case, as part of the *res gestae.* Such declarations, it is true, so far as they show the mental condition of the testator, may constitute a part of the proof of undue influence. But standing alone they furnish no proof of the alleged undue influence."

This text is supported by a wealth of citations. Among others is *Waterman v. Whitney,* 11 N. Y. 157, 62 Am. Dec. 71, and note. As illustrative of the general rule, the author quoted from this case as follows:

"The difference certainly is very obvious between receiving the declarations of a testator to prove a dis-

tinct external fact, such as duress or fraud, for instance, and as evidence merely of the mental condition of the testator. In the former case it is mere hearsay, and liable to all the objections to which the mere declarations of third persons are subject; while in the latter it is the most direct and appropriate species of evidence.''

In the case of *Estate of Heaverne,* 118 Or. 308 (246 P. 720), this court, speaking through Mr. Justice Coshow, held that the declaration made by the testatrix that an attempt was made to influence her in making her will was hearsay and inadmissible. See, also, *In re Dale's Estate,* 92 Or. 57, 66 (179 P. 274).

In the case of *Griffith v. Benzinger,* 144 Md. 575 (125 Atl. 512), appears a valuable discussion relating to the admissibility of declarations of a testator to show undue influence. In the course of that discussion the court states that the law relating to testamentary dispositions induced by undue influence is too well settled to justify any elaborate exposition, ''but the difficulty lies in determining whether a given state of facts will support an inference that such a disposition of property in a given case is the result of fraud or undue influence.'' Continuing, the opinion reads:

''The general principles controlling such an inquiry are stated in the case of *Grove v. Spiker,* 72 Md., 301, where it was said: 'Undue influence is that degree of importunity which deprives a testator of his free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act. It is closely allied to actual fraud; and like the latter, when resorted to by an adroit and crafty person, its presence often becomes exceedingly difficult to detect. Indeed, the more skillful and cunning the accused, and the more helpless and secluded the victim, the less plainly defined are the badges which usually denote it. Under such conditions, the results accom-

plished, the divergence of those results from the course which would ordinarily be looked for, the situation of the party taking benefits under the will towards the one who has executed it, and their antecedent relations to each other, together with all the surrounding circumstances, and the inferences legitimately deducible from them, furnish, in the absence of direct evidence, and often in the teeth of positive testimony to the contrary, ample ground for concluding that fraud or undue influence has been resorted to and successfully employed.' "

The court then quotes from the case of *Frush v. Green*, 86 Md. 501 (39 Atl. 863), as follows:

"It [undue influence] often closely resembles and is near akin to actual fraud, and like the latter when most cunningly employed is exceedingly difficult to expose. From the very nature   *   *   *   of the wrong itself, it is rare that direct evidence can be procured to unmask it, and hence the results accomplished in a given case, the divergence of those results from the course which would ordinarily and naturally be looked for, the situation of the parties taking benefits under an instrument, alleged to be the product of its dominion towards the person who has executed that instrument, their antecedent relations to and intercourse with each other; the legitimate, but unrecognized claims of others upon the bounty of the one who has discarded them; their dependence upon him; his prior declaration; the instincts of justice and the promptings of gratitude of which every unbiased mind is sensible; the natural ties of affection, together with all the circumstances surrounding the entire transaction under investigation, and the inference legitimately deducible from them, often furnish, even in the teeth of directly contradictory testimony, ample ground for the conclusion that undue influence has been successfully resorted to, to accomplish an end which is grossly unjust and whose very existence cannot be satisfactorily accounted for or explained except upon the theory that undue influence has produced it."

The general principle controlling the admissibility of the declarations of a testator is thus stated in II Alexander, Commentaries on Wills, at pages 920-923:

"Declarations of a testator not part of the *res gestae* are not admissible either to prove or disprove any statement of fact contained in them, nor for the purpose of showing the exercise of undue influence. But undue influence is associated with testamentary capacity, a strong and vigorous mind being better able and more likely to resist any influence than one which is weak and vacillating. For such reasons, declarations of a testator, either before or after the execution of the will, are admissible because from a fair inference from all the circumstances such declarations show the party's mind at the time the will was executed, his susceptibility to the influence, and his relations with those around him and the persons who are the beneficiaries of his bounty.   *   *   *

"On the issue of undue influence, two elements are involved: (1) The conduct of the party charged with exercising the influence, and (2) the mental state of the testator as affected by such influence which may require a disclosure of his strength of mind and of his purpose as to the disposition of his property   *   *   *.

"While declarations of a testator are not sufficient to establish the fact of undue influence, they are admissible to show its extent and effect."

In 28 R. C. L., at section 107, the author thus pronounces the law concerning the admissibility of declarations of a testator as evidence on the issue of undue influence:

"It is not essential that statements made by him should be of the *res gestae* to render them admissible, though their value as evidence diminishes in proportion as they are remote from the date of the will. It is a generally recognized rule that they may be introduced in evidence to show the state fo the testator's mind.   *   *   *   In a will contest, the testator's declarations afford no substantive proof of undue influence, and

before the caveators can recover they must prove by evidence other than the testator's declarations that undue influence was actually exerted over him. * * * The weight of opinion is against the admission of pre-testamentary declarations to establish the substantive fact of undue influence. * * * Declarations of a testator not made contemporaneously with the execution of his will, when offered in evidence to prove undue influence, are nothing more than hearsay evidence.''

In 5 Nichols Applied Evidence, at section 52, ''Undue Influence,'' the rule is stated as follows:

''Declarations of a testator, whether made before or after the execution of the will, are not competent as direct evidence of undue influence, but are only admissible to show the mental condition of the testator at the time of making the will, and his susceptibility to the influences by which he was surrounded at the time. Declarations of testator are admissible to show decedent's feelings and desires with respect to contestants, and as bearing upon his state of mind.''

It is argued in the instant case that the testator has closed the door of his bounty to his wife and her children, and that such a course is contrary to natural justice. As to the correctness of this assertion, we make no comment. It is not disputed, however, that, at the time the will was executed, testator was of competent age, and possessed of that degree of mentality that authorized him to dispose of his real and personal property as he might choose. Under those admitted facts, in so doing he but pursued his statutory right. See *Stubbs v. Abel et al.*, 114 Or. 610 (233 P. 852, 235 P. 505) ; *In re Stephenson's Estate*, 132 Or. 234 (285 P. 224). Also see Hawkins on Wills (2d Ed.), pp. 4 and 5, where the author, speaking in defense of wills of like character to the one under consideration, says:

''No man is bound to make a will in such a manner as to deserve approbation from the prudent, the wise,

or the good. A testator is permitted to be capricious and improvident, and is, moreover, at liberty to conceal the circumstances and the motives by which he has been actuated in his dispositions. Many a testamentary disposition may seem to the world arbitrary, capricious and eccentric, for which the testator, if he could be heard, might be able to answer most satisfactorily."

■ This statement of the law is peculiarly applicable to the situation here presented. That it is recognized and accepted as the law in other jurisdictions, see *Saxton v. Krumm,* 107 Md. 401 (68 Atl. 1056, 17 L. R. A. (N. S.) 477, 126 Am. St. Rep. 393), where the supreme court of Maryland, in dealing with the question, thus expressed its view:

"It would be a great inconsistency and absurdity to accord to a testator the power to dispose of his estate in any way he may think proper, consistent with the settled principles of the law, and at the same time say that his will may be annulled if it appears that its disposition is unjust, inequitable or unaccountable. The effect of such a principle would be the practical denial of the free right of testamentary power in a very large class of cases."

The law governing a case such as the one before us is well settled. However, there is much variance and dispute in the testimony of the contestant and that of the proponent of the will in question, and the difficulty presented is in determining where the truth lies.

Briefly stated, the record discloses that Charles E. Wayne, the testator, whose last will and testament is attacked by Mattie V. Wayne for alleged undue influence exercised by his niece in the making of that will, was formerly a resident of Siskiyou county, California, where he was born in 1872. He was twice married. His first wife was one Nellie Carlock, the only daughter of a banker at Fort Jones, California, who left to her an

estate of about $100,000. On July 16, 1922, she died childless, leaving all her property to Charles E. Wayne, her husband. This property Wayne preserved and likewise added some accumulations thereto. The property so inherited, together with the added amount, is the property that has been bequeathed and devised by him to Lenna Huber.

On or about February 16, 1922, Dr. Kelly, a dentist of Portland, died, leaving as his widow Mattie V. Kelly, the contestant herein, and three minor children.

It appears that Dr. Kelly and Charles E. Wayne were active in promoting the work of the Masonic order and thereby became intimate friends, and that, during the last illness of Dr. Kelly, Wayne and his then wife became acquainted with Mattie V. Kelly.

On August 5, 1925, Mrs. Kelly and Charles E. Wayne were married she taking with her to the new home her two youngest children. The contestee asserts that the domestic trouble between Wayne and his second wife commenced soon after their marriage. It appears that Jerome Kelly, the eldest of the three children, was a wayward boy, and that Wayne required the contestant to promise "not to bring him into the home of the testator." But the strength of a mother's love for her child thwarted the promise, and the son was welcomed to his mother's home where he was the source of many disputes between his mother and his stepfather.

While the contestant asserts that Lenna Huber is responsible for the provisions of the will, its defenders assert that it was the conduct of the contestant that caused Wayne to execute a will that upon its face appears to the writer to be unjust. In July, 1927, she filed her duly verified complaint for divorce, whereby she published to the world that Charles E. Wayne,

after his marriage to her, began and continued a long, deliberate and studied course of cruel and inhuman treatment, rendering her life with him burdensome; that, among other things, he twitted her about her failure to repay the Masonic lodge for the funeral expenses incurred by it in the burial of her husband, Dr. Kelly. She alleged that Wayne exhibited peculiarities, idiosyncrasies and eccentricities that were peculiarly his. She asserts that Wayne at times insisted upon doing his own washing and kept his soiled clothing in a locked suitcase. She alleged that he was of a jealous disposition; that he refused to change his clothing except at infrequent intervals for the reason that he did not desire to be like other people; that he boasted about wearing one collar, one shirt, and one pair of hose, and using but one handkerchief a week; that he frequently locked the door of his room at night, telling plaintiff "that he wished her and her damned friends to keep out of his room." She alleged that when she attempted to read or sleep, Wayne would persist in talking aloud to himself for hours. She accused him of refusing to greet her in the morning, or to say goodnight in the evening. She alleged that he was extremely penurious, stingy and parsimonious as regarded herself; that he insisted upon purchasing all food for the household, and frequently brought home only one chop, one tomato, and one article of food for each person to be served. She asserted that, notwithstanding his fortune, Wayne seldom gave her money, and that, when he did, it consisted of two or three dollars at a time; also that he measured the gasoline in the family automobile on the infrequent occasions when she took the machine out, and measured it again upon her return, and that shortly before the complaint was filed he requested her not to

use his automobile in his absence. She also alleged that Wayne continually found fault with her "for eating what defendant terms so much food at his expense." She asserted that, notwithstanding his fortune, Wayne every Saturday night, and, if it was consumed by the family before the succeeding Saturday night, he bitterly complained and scolded and upbraided her; that the coffee was consumed more rapidly than he approved, and that he often complained about the expense of keeping a wife and family. She alleged that, on many occasions and innumerable times, he applied coarse and vile epithets to her, and frequently called her a liar, and a damned liar, and said to her "Get to hell out of here, and damned quick, too," and "Why in hell don't you take your things and get out?" She alleged that he declared he had made a great mistake in marrying her, that he cared nothing for her, and that to him their marriage contract meant nothing. She asserted that upon one occasion, when he called her a liar and a damned liar, he struck her in the face with his fist and knocked one of her teeth out, causing her lip to bleed and swell; that he then and there commanded her to "sit down or I will knock you down," and shoved her against a chair, bruising her hip and side. She alleged that all the acts set out above were committed without any provocation upon her part, and that at all times she had been a dutiful wife and mother, and had endeavored to carry out her marriage vows. She then described Wayne's property, stated its valuation, described her own financial condition, and prayed for a decree, among other things, awarding to her the sum of $65,000 in cash as gross alimony for her maintenance and support.

A few days after the above-described complaint was filed, it was dismissed without prejudice, and on December 22, 1927, Charles E. Wayne made, executed and published the will involved in this litigation, at the same time destroying a prior will made by him in July, 1926, which contained the same identical bequest to the contestant herein as that incorporated in the will the subject of dispute. We note, however, that the record fails to disclose the identity of the residuary legatee named in the former will.

That the contestant relies upon hearsay to prove the substantive fact of undue influence is apparent from her own testimony. We quote the following excerpts therefrom:

"Q. Well, what did she (Mrs. Huber) do? What did she do and say to win him, as you say? A. In front of me she didn't say anything. It was when she would take him by himself that he would come home and tell me these things.

"Q. *. * * She never said anything in front of you? A. No.

*        *        *        *        *

"Q. When you say she was constantly poisoning him, you are only basing that conclusion upon what somebody else has told you? A. What Mr. Wayne told me.

*        *        *        *        *

"Q. How was she after him? A. Just poisoning him all the time.

"Q. What do you know about what she did with the poison? A. Because he came back and told me.

"Q. That's all you know, isn't it, what he told you? A. Well, and his actions when he came back.

"Q. I know, but I say all you know about it is what he told you? A. Yes."

It is unnecessary for this court to determine the testator's motive in making the comparatively small bequest to the contestant herein. The writer does not

find that it grew out of the humiliating charges set forth in her petition for divorce and for $65,000 alimony. We have already observed that about a year prior to the filing of the divorce complaint he had made a will wherein there appeared the same identical provision for Mrs. Wayne, and when his attorney, Lawrence McNary, directed his attention to the paltry bequest, the testator declared, in effect, that the bequest was sufficient, and that it was "right and just, and I want you to make it that way." It is not unlikely, however, that the charges contained in Mrs. Wayne's petition for divorce, whether true or false, may have steeled him in his determination that his estate inherited from his former wife should not enrich the second. However, the omission from the divorce complaint of any allusion to Lenna Huber constitutes a weighty circumstance pointing to the exculpation of the chief beneficiary of the will from the commission of wrongful or unlawful acts for the purpose of exercising an undue influence over the mind of her uncle, Charles E. Wayne, in the disposition of his property. The many charges of cruelties alleged in the complaint are silent witnesses to the fact that contestant combed her married life with Wayne for every circumstance that would tend to establish grounds for a divorce. But, in that voluminous complaint, with its many charges of wrongdoing on the part of testator, the defendant therein, not one word is written that directly or indirectly associates Lenna Huber with any interference with the marrige relations or domestic happiness of her husband and herself.

Nor does the writer find that the precautionary words uttered by the chief beneficiary to her uncle when she warned him to look out for the soup prepared

and served to him by Mrs. Wayne were, in any appreciable degree, responsible for the execution of the will. The facts shown by the record strongly indicate that this cautionary advice made no serious impression upon the mind of the testator. Even during the time he was living separate and apart from his wife, he dined with her at least once a week, and, until the day of his death, freely partook of the food she prepared. While he seemed to think that his wife was extravagant, or, as he once termed it, "money mad," he never believed, or even dreamed, that she was capable of committing an infamous crime for money. Upon the other hand, it appears that he believed his wife to be one of the "best women that God had ever made." See testimony of Mr. George Estes, a witness for contestant.

We believe, however, that the testimony of Mr. George Estes sheds some light on the purpose of Wayne in leaving to his wife a bequest of so little consequence, i. e., the sum of $4,000 out of a fortune of $120,000. It appears from the divorce complaint that Wayne possessed a suspicious and jealous disposition. Mr. Estes, testifying on behalf of the contestant, tells us that on November 29, 1927, he and the testator engaged in a long personal conversation involving the past, present and future affairs of the Waynes; that, on that date, testator said that "he was happy over a complete reconciliation with Mattie"; that he advised with Estes about making a disposition of his property in the event of death; that he talked of leaving the bulk of his estate to his wife, and talked over the matter of a contemplated trust in favor of his stepson, Matthew Kelly. In this connection, witness testified:

"Also, he (Wayne) said, 'I took it up with you in the past years about erecting a trust in behalf of my

little man, Matthew, and I have concluded after considering what you said about trust companies, and my own experience with individuals as trustees, that it will be as well with her as with any other arrangement that I could make.' He continued by saying, 'My idea was to avoid another husband after my death throwing my money away. She would naturally get married—I don't expect anything else—in order to protect Matthew from another husband.' ''

Laura Brown, a sister of contestant, tells us that subsequent to the divorce proceedings, or, in April, 1928, Wayne and his wife were ''just as happy and congenial as two people could possibly be.'' She further stated that she saw them frequently after the termination of the divorce proceedings, and that Wayne's attitude toward his wife was ''very affectionate.'' This testimony has no tendency to prove that Wayne was prejudiced or afraid of his wife, or that Lenna Huber was in any way dominating or holding any dominion over him.

■ The testator possessed a number of worthy though poor relatives who might have hoped to share in his bounty. They were forgotten. His two stepchildren, whom he seemed to love dearly, were also forgotten. His wife was cut off with a pittance. Despite all this, in making his will Charles E. Wayne was exercising the power that the law gave him, and, regardless of its alleged unfairness, this court can not rewrite that instrument. He was an intelligent, a self-opinionated and conscientious man. A number of witnesses, both prominent and reputable citizens, have taken the stand and have sworn that he ''possessed a mind of his own''; that he was strong-willed, and so firm in his convictions as to be called stubborn. The contestant tells us that he would often come home sullen and silent

after a visit with Mrs. Huber, and that, after a period of time, he would recite to her much matter that Lenna Huber had attempted to implant in his mind. How strange, how passing strange, that this strong-willed man should remain in the society of his evil-minded niece and listen to her condemnatory remarks, and then return home to rehearse the fallacious story of "poison" to his beloved wife.

■ Upon the one side in this case, we have the solemn declarations of the testator expressing his wishes in writing. Opposed are the oral declarations of the dead as repeated by the testimony of the contestant and at least three witnesses on her behalf. These oral declarations fail to prove that the will is the result of constraint or coercion on the part of Lenna Huber or any other person. Upon the other hand, it has been established by lawful proof that the testator possessed testamentary capacity; that the will forming the subject-matter of this proceeding was duly executed by him and attested by two competent witnesses who subscribed their names thereto at his request and in his presence, and who saw him sign the will and heard him declare the same to be his Last Will and Testament. The will is the free and voluntary product of the testator's mind, and is entitled to probate.

Notwithstanding there were a number of legatees who were not made parties to the contest, the trial court revoked the will in its entirety. For the reason that we hold the will to be valid, we do not discuss the lawfulness of this order.

The decree made and entered by the court below is hereby reversed and set aside in its entirety.

After a due consideration of the circumstances existing in the instant case, we conclude that the costs and

disbursements of this proceeding, in this court and in the court below, should be paid by the estate of Charles E. Wayne. It is so ordered.

CoSHOW, C. J., and BEAN and BELT, JJ., concur

---

Petition for rehearing denied December 16, 1930

## ON PETITION FOR REHEARING
### (294 P. 590)

BROWN, J. ■ The contestant has filed a petition for rehearing, in which it is asserted, in part, that we erred in our original opinion in holding that the law cast upon her the burden of proof to establish that the will was the result of undue influence. Let us see. Contestant alleged that the will of Wayne, her husband, was not the expression of his own wishes, but that he was coerced to make the same by Lenna Huber, his niece. The allegations charging undue influence were denied. This put the cause at issue, the contestant assuming the affirmative and the contestee the negative.

It is not only established by text-writers and court decisions that evidence shall be produced by the party having the affirmative of the issue, but that rule is codified as Oregon Code 1930, § 9-1001. That section reads:

"The party having the affirmative of the issue shall produce the evidence to prove it. Therefore, the burden of proof lies on the party who would be defeated if no evidence were given on either side."

This question was before our court in *Branch v. Lambert*, 103 Or. 423 (205 P. 995), and it was there held that under the section just quoted "actions against executors and administrators are governed by the general rules that, in civil actions, the party having the

affirmative of the issue shall produce the evidence to prove it, and that, when the evidence is contradictory, the finding shall be in conformity with the preponderance of the evidence.''

■ In support of the charge of undue influence, counsel cite *Holman's Will,* 42 Or. 345 (70 P. 908). For a thorough understanding of that case and the reasoning employed therein, the opinion should be read in its entirety. However, from that opinion, written for the court by Mr. Justice WOLVERTON, it will be helpful to set out the following declaration, which seems to the writer to be based upon sound doctrine, and one holding squarely with our former decision in this case. The learned jurist wrote:

''Common understanding suggests that a will should be natural; that is, conformable to the nature and disposition of the person who makes it. Where it does not conform to this idea, it is a circumstance, no doubt, to be considered in connection with other proof bearing upon the question as to whether or not it was the result of undue influence, but, within itself, affords no conclusive or sufficient proof for the purpose, and does not, therefore, raise a presumption that it was so procured: *Salisbury v. Aldrich,* 118 Ill. 199 (8 N. E. 777). In the case of gifts *inter vivos* and contracts made in favor and to the advantage of a person standing in a fiduciary or close confidential relation with the donor, or other contracting parties, such as trustee and *cestui que* trust, guardian and ward, attorney and client, physician and patient, or priest or religious adviser and his parishioner, and the like, the burden of showing that the transaction was fairly conducted, and that no advantage was taken of the relationship, lies with the one having secured the advantage. The reason, however, for this rule, is that the person receiving the benefit has actively participated in the transaction, as a party thereto, and the explanation required is very naturally within his knowledge and power. Such

a reason does not obtain as it relates to a bequest, as the person to whom it is made may not, in point of fact, have had any part in, or even knowledge of, the act which gives him the advantage; and no presumption arises from the mere relationship of the parties that the donee has abused his position of confidence and turned it to his own advantage.''

This language, we reiterate, is particularly clear and persuasive, and is impossible of misinterpretation.

We direct attention also to the expression of Mr. Justice BURNETT, speaking for the court in the case of *In re Sturtevant's Estate,* 92 Or. 269 (178 P. 192, 180 P. 595), where the question is analyzed thus:

''The reason underlying the rule as to the burden of proof respecting testamentary capacity and undue influence may be thus stated: If there is no will in existence, the property of a testator is distributed according to the statute of descents. If anyone would interrupt this course of distribution, he must show not only a properly executed will but that there was a testator competent to publish such a document. The persons naturally interested in the estate under the statute of descents have not had their day in court where the will has been admitted to probate in common form. Consequently, the burden of making a different disposition of the property lies upon him who propounds the will to show that the testator had testamentary capacity and that the instrument in question was executed in due form of law. On principle, the question is different where the effort is to overturn the will on the allegation that it is the product of undue influence. This is a species of fraud by the exercise of which the nominal testator is supposed to have been deluded into making a disposition of property which is not the product of his own mind.

''It is hornbook law that he who alleges fraud must prove it, so that in good reason, as stated in *Simpson v. Durbin,* 68 Or. 518 (136 P. 347), the burden of establishing undue influence lies upon those alleging it.''

The able justice cites the case of *In Re Will of Hiram V. Allred,* 170 N. C. 153, 158 (86 S. E. 1047, 1049, Ann. Cas. 1916D, 788, L. R. A. 1916C, 946, 949) calling attention to the following quotation therein from *Bancroft v. Otis,* 91 Ala. 279 (8 So. 286, 24 Am. St. Rep. 908):

"With respect to testamentary dispositions, the primary presumption, upon which the whole superstructure of the doctrine of presumed undue influence in contracts and gifts *inter vivos* rests, is entirely lacking. They take effect upon the death of the donor. They involve no deprivation of use and enjoyment. There can be, with respect to them, no assumption that the donor would not voluntarily part with his property, since, in the nature of things, it must then pass from him to others, selected by himself according to the dictates of his affections, or appointed by the law of descents and distributions; and in either case without consideration moving to him. It is not out of the usual course of things, but in accordance with the exigencies of mortality, that the property should cease to be his, and should become that of another. And the very considerations which lead to suspicion, which must be removed in transactions *inter vivos*—friendship, trust and confidence, affection, personal obligation—may, and generally do, justly and properly, give direction to testamentary dispositions."

■ Answering the contention that the will in the instant case is unjust, we make particular reference to the case of *Beakey v. Knutson,* 90 Or. 574 (174 P. 1149, 177 P. 955) where Mr Chief Justice McBride said:

"It may be said that the will is unjust, * * * but, perhaps unfortunately, the law does not avoid a will because it fails to square itself with what persons other than the testator deem to be justice."

In the case of *Estate of Allen,* 116 Or. 467 (241 P. 996), the testator, who was aged and feeble when he made his will, devised property to the widow to the

exclusion of the four daughters and one son. The daughters and named son contested the will, on the ground of undue influence on the part of the widow and two remaining sons. In concluding our opinion therein, we held:

"The law casts upon the contestants the burden of proving their allegation that the will is the result of undue influence brought to bear upon the testator."

Another case wherein the same issues are presented is *In re Estate of Moore,* 114 Or. 444 (236 P. 265). In that case the daughter contested the will of her father on the ground of undue influence upon the part of her step-mother, and the court held that the burden of proving such influence by the preponderance of evidence was upon the daughter. From the opinion of the court, which is scholarly and instructive, we carve the following:

"In brief, we think, from a careful perusal of five huge volumes of testimony, * * * the preponderance of the evidence establishes three of the contentions of the contestant. First, a desire of the defendant to alienate from his daughter the affections of the testator; second, that she had the ability thus to influence the testator and makes his will bend to hers; and third, that she had the opportunity to carry out that purpose. The ground of contention remaining is whether or not in fact the defendant had so unduly influenced the testator that the result was a will, not the product of his own volition, but that of his wife.

"It is an attribute of property that the owner thereof has the right to dispose of it as he pleases. It is his property. * * * If the contest is waged on the ground of insanity or lack of mental capacity to make a will, the burden is cast upon the proponent to establish by the preponderance of the testimony that the testator had testamentary capacity to make the will offered for probate. As stated, this is not that kind of a case. The sole ground of contest the daugh-

ter urges is that her father was unduly influenced to make the will he did, and the burden is upon her to establish her contentions by the preponderance of the evidence. *Simpson v. Durbin*, 68 Or. 518 (136 P. 347); *In re Sturtevant's Estate*, 92 Or. 269 (178 P. 192, 180 P. 595); *Rice v. Rice*, 95 Or. 659 (188 P. 181).

\* \* \* \* \*

"The contention of the plaintiff is that the will is an unnatural one and hence should be set aside, but the law is, that courts cannot make a will for a testator. Neither is it for them to overturn what he has fashioned himself, providing he has testamentary capacity and that his own volition is not overpowered by that of another. \* \* \* A person may be influenced legitimately to make his will in a certain way. It is only when that influence is unduly exerted to the extent that it entirely supersedes the desire or wish of the testator and substitutes for it the purposes and intent of the one exercising the undue influence."

See, also, *In re Estate of Riggs*, 120 Or. 38 (241 P. 70, 250 P. 753), and local authorities cited in support thereof.

The contestant relies largely upon the early case of *Greenwood v. Cline*, 7 Or. 17. We cannot follow counsel. There is little similarity between the facts in that case and those in the one before us. In the Greenwood case, the testatrix executed a will when 62 years of age, and died at the age of 64. By the terms thereof she bequeathed to a son and a daughter $100 each, and the residue of her estate, amounting in the aggregate to about $26,000, to Mrs. Mary Cline, her remaining child, and Olive Newsom, a grand-daughter. The will was assailed on the ground that the testatrix was of weak mind at the time of its execution, and that she was laboring under a delusion with respect to contestant arising out of undue influence exercised upon her impaired mind by Mrs. Cline and Mrs. Newsom.

The evidence showed that a few years before making her will, the testatrix had suffered a severe attack of paralysis, from the effects of which she never fully recovered; that her memory became defective; that she would ask the same question repeatedly; that she would lease a tract of land and forget about it the next day. Two physicians testified that her mental powers were impaired. Other persons testified that "her eyes had a dead expression and her manner was sometimes like that of an intoxicated person"; that she was "peculiar" in her conversations, and was absent-minded; that she paid no attention to her housework; that she would yield her opinion to those with whom she talked; that, at one time, while going alone from Salem to Howell Prairie, which was her home, she became "turned around" and traveled back to Salem; that she, in company with the Clines, attended spiritual seances at the house of avowed Spiritualists; that, on one of these occasions, when the testatrix was present, a pretended communication was produced purporting to come from her deceased husband, and which undertook to advise her that her son William was a "roughneck" and liable to squander her property; that, on another occasion her daughter, Mrs. Cline, went to Howell Prairie to visit her after attending one of the seances, and told her that her father's spirit had ridden out with her in the stage and talked with her, and that he was very anxious that her mother should move to Salem and live with her. In that case it was properly held that the testatrix had been unduly influenced.

■ The contestant avers in her petition:

"That, in the making and executing of said will, said Lenna Huber so dominated and unduly influenced the mind and will of said decedent as to substitute her will and wish for his to such an extent as to cause

decedent in the making of said will to breach, violate, and disregard a contract theretofore made by and between your petitioner and decedent based upon both a valuable and a good consideration, in and by which (decedent) promised and agreed to make and leave a will bequeathing and devising all his property and estate to his said wife, your petitioner.''

The contract alluded to was invoked by this contestant on March 18, 1929, when she filed a complaint against Lenna Huber, and Lenna Huber as executrix of the will of Charles E. Wayne, deceased, wherein she. prayed for the specific performance of an agreement alleged to have been made by her and Charles E. Wayne whereby Wayne expressly promised and agreed that, in consideration of her dismissing her divorce suit against him and giving up her rights thereunder, and forgiving and condoning his treatment of her as alleged in the divorce complaint and resuming marital relations with him, that he would make a last will and testament, in which he would devise and bequeath to her all property owned by him, both real and personal, and wheresoever situate. She alleged that this proposition was made to her by Wayne, and that she accepted it. In rendering his opinion in that case, the trial judge said:

''She (Mrs. Wayne) testified to numerous acts of cruelty. There was some corroboration as to minor incidents, but which of themselves the court believes would not be sufficient to support a decree for divorce. Mr. Wayne, of course, could not tell his side of the story and could be heard only through those with whom he discussed the allegations in the divorce complaint. They say he denied those allegations of cruel treatment. Plaintiff herself testified that he told her the complaint was 'terrible, atrocious and untrue,' and that he blamed her lawyer for the allegations in it. One of her witnesses testified that Wayne said he could

account for her commencing the suit for divorce only by believing her to be money mad. From such evidence, it seems certain that could he now speak his testimony would be a flat denial of the allegations and of the plaintiff's testimony as to the alleged cruelty."

Upon the trial in the circuit court, relief was denied to Mrs. Wayne under the alleged contract, and a decree entered dismissing her suit. From this decree no appeal has been taken. The matter having been formerly adjudicated, with this alleged contract we have no concern.

Great stress is placed by contestant's counsel upon the subject of "poisoning," and a remark made by Mrs. Huber to her uncle that "I should think you would have been afraid to eat the soup for fear it was poisoned." But, after all is said and done, the fact that Wayne seems to have enjoyed the company of the contestant, and that he dined with her frequently up to the time of his death, strongly indicates that he was not greatly impressed or worried by the "poison" talk; and, in the opinion of the writer, this fact alone is sufficient to put at rest any alleged suspicion on the part of Wayne with respect to the matter. Moreover, in July, 1926, more than a year prior to the talk in reference to poison, Wayne made a will, wherein he fixed the contestant's legacy at $4,000. In December, 1927, some months after the talk, he made the will in controversy here, and fixed her legacy in the same amount. We have carefully studied this phase of the case and have weighed the actions and remarks of the testator with relation thereto; and from a consideration of the question in its entirety, it seems clear that the testator felt no unrest in that regard.

Running all through the record in this cause, we find much talk of coercion and undue influence; but

nowhere do we find any testimony showing that Wayne was surrounded by any person or persons who exerted undue influence over him at the time he made and executed his will. After the contestant herein filed her suit for divorce against Wayne, wherein she painted him as stingy, niggardly, parsimonious, eccentric, brutal, and a wife beater, Lenna Huber made some observations concerning her; but she has failed to bring into the record any testimony that Mrs. Huber influenced, unduly or otherwise, the act of her uncle, in making her the residuary legatee of his will. She was fond of her uncle, and her uncle was fond of her. It is true, as contestant says, that she kissed her uncle, and her uncle kissed her. There was nothing untoward in that. So far as the record indicates, Mrs. Huber's character is not subject to criticism. Upon the other hand, there was an attempt to coerce Wayne into leaving all of his property to his wife upon his death. In the complaint praying for specific performance of the contract hereinbefore discussed, contestant says that she had a good cause for divorce against Wayne because he had treated her in a cruel and inhuman manner and had subjected her to personal indignities rendering her life burdensome, but that she ceased to press her cause of suit for the reason that he promised to make her the sole beneficiary under his will, and that she dismissed the divorce suit only because of the importunities of Wayne and the promises above set out. It will be noticed, however, that, notwithstanding the divorce complaint teems with alleged wrongdoings on the part of Wayne extending from a few weeks after their marriage to the time the suit was filed, it contains not a single allusion to Lenna Huber, or to her alleged evil influence upon Wayne. This fact is significant.

■ In order that the contestant may prevail in this cause, certain essential facts must be established by her. First, she must establish that undue influence was, in fact, exerted; second, that by such influence the contestee was successful in subverting and controlling the will of the testator. Both of these facts must be proved by the weight of the evidence in order to defeat the will.

■ Under the rule laid down by the numerous authorities cited and quoted in our original opinion, evidence of declarations of the testator made before or after the making and execution of his will is not admissible as substantive proof of undue influence. Such statements are but hearsay and are incompetent for that purpose. They are admissible, however, for the purpose of shedding light upon the condition of mind of the testator. The writer concludes that the improvident assertions of Mrs. Huber in the matter of the domestic relations of her uncle and aunt subsequent to the filing and dismissal of the divorce complaint, coupled with her treatment of Mrs. Wayne immediately after the death of Wayne, constitute circumstances tending to show that she may have had the desire to influence her uncle's conduct in the execution of his will. In addition, the record discloses a number of circumstances tending to show that she had the opportunity to influence the making of his will. But that is not enough. There is no testimony that shows that she actually had the power to dominate her uncle's mind, or that she did so dominate and control him "that the result was a will not the product of his own volition," but that of her desires. Many intimate friends of the testator took the witness stand and testified to the admirable qualities of mind and steadfast character possessed by him. He was not a weakling, to be dominated by his niece, or yet his

wife. It is obvious from the record that the contestant did not dismiss the divorce proceedings because of any promise of a consideration therefor, but because Wayne warned her that he would proceed to fight the case, and that his defense was in the course of preparation. As a result of the charges therein made by her against her husband and the publication thereof in the newspapers and by the public records, Wayne was cut to the quick; and his friends testify that he was very deeply mortified. Nevertheless, under the advice of his attorney as to his duty in the matter, he continued to support his wife and her two youngest children.

In her brief on petition for rehearing, the contestant tells us that Wayne resumed marital relations with her immediately after the withdrawal of the divorce suit, which relations continued until the moment of his death; that Wayne told George Estes in November, 1927, that he was happy over a complete reconciliation with Mattie, and had agreed to leave her the bulk of his estate; that he told Laura Brown the same thing; that he told Marguerite T. Briedwell the same thing; that he told Adams, one of Lenna Huber's witnesses, that he intended to provide for Mrs. Wayne and the children.

Conceding, for the sake of argument, the truth of these statements, it but spells disaster to the contention of contestant that Lenna Huber had succeeded in dominating her uncle by implanting in his mind a dread and fear of his wife, or by any other means.

We have again reviewed the entire record in this case with exceeding care. From a painstaking study thereof, we are satisfied that our former decision is fully sustained by the evidence. It follows that the petition for rehearing is denied.

CosHOW, C. J., and BEAN and BELT, JJ., concur.